[No. D038580. Fourth Dist., Div. One. June 26, 2002.]

GOLDEN EAGLE INSURANCE COMPANY, Plaintiff and Respondent,
v.
INSURANCE COMPANY OF THE WEST, Defendant, Cross-complainant
and Appellant;
CONNECTICUT INDEMNITY COMPANY, Cross-defendant and
Respondent.

838

## Counsel

Summers & Shives, Martin L. Shives and Peter B. Lightstone for Defendant, Cross-complainant and Appellant.

Law Offices of Glenn M. White and Glenn M. White for Plaintiff and Respondent.

Lewis, D'Amato, Brisbois & Bisgaard, Peter L. Garchie and Jacqueline S. Vinaccia for Cross-defendant and Repondent.

## Opinion

**McCONNELL, J.**—This case involves a dispute among insurers regarding the allocation of defense costs of an indemnitee that the insured assumed under an indemnity agreement. Golden Eagle Insurance Company (Golden Eagle) and Insurance Company of the West (ICW) each paid one-half of an arbitration award in favor of the indemnitee for $605,374.25 in attorney fees and costs incurred in defending against third party property damage claims;

Connecticut Indemnity Company (CIC) refused to contribute. The trial court determined that the contractual liability provisions of the commercial general liability (CGL) policies do not cover the insured's liability for the indemnitee's defense costs, because such costs are not *damages* within the meaning of the policies. Based on that finding, the court shifted the entire burden of the arbitration award to ICW on the ground that the indemnitee was an additional insured under the ICW policies, and ICW breached its duty to provide a defense.

We hold, in accordance with the objectively reasonable expectations of the insured, that the indemnitee's defense costs are sums the insured is legally obligated to pay as *damages* because of property damage. Consequently, each of the three insurers is on the risk assumed by the insured/indemnitor and there is no equitable basis for shifting the entire burden to ICW as the indemnitee's insurer.

We (1) reverse summary judgments for Golden Eagle and CIC on the complaint and cross-complaint, respectively; and (2) remand the matter to the trial court for its (a) entry of an order granting ICW's motion for summary judgment on the complaint and judgment for ICW thereon, and (b) reconsideration of its denial of ICW's motion for summary judgment on the cross-complaint. The latter issue requires the court's exercise of discretion in determining whether ICW submitted sufficient evidence to support a particular method of allocation, and if so, the amount that CIC must contribute toward the arbitration award.

## FACTUAL AND PROCEDURAL BACKGROUND

In the 1980's D. J. Plastering (D. J.) was a subcontractor on several residential construction projects of Davidson Communities, Inc., and related entities (collectively Davidson). The subcontracts contained a type I indemnity agreement,[1] which provided in part:

". . . Subcontractor shall indemnify, defend and save harmless Contractor . . . from . . . any and all claims, demands, causes of action, damages, costs, expenses, losses or liabilities, in law or in equity, of every kind and nature whatsoever . . . arising out of or in any manner directly or indirectly connected with the work to be performed under this agreement, howsoever caused, regardless of any negligence of Contractor . . . .

---

[1] A type I indemnity agreement "provides ' "expressly and unequivocally" that the indemnitor is to indemnify the indemnitee for, among other things, the negligence of the indemnitee.' [Citation.]" (*Heppler v. J.M. Peters Co.* (1999) 73 Cal.App.4th 1265, 1276, fn. 7 [87 Cal.Rptr.2d 497].)

"Subcontractor shall, at Subcontractor's own costs, expense and risk, defend any and all suits, actions or other legal proceedings that may be brought . . . by third persons against Contractor . . . on any such claim . . . and shall reimburse Contractor . . . for any and all legal expense incurred . . . in connection therewith or in enforcing the indemnity granted in this paragraph."

D. J. was insured under successive CGL policies issued by Golden Eagle, ICW and CIC. The policies covered D. J.'s liability for third party bodily injury or property damage claims, and D. J.'s assumption of the tort liability of prime contractors, such as Davidson, under indemnity agreements (contractual liability coverage). Davidson was also named as an additional insured on the ICW policies.

Beginning in 1995 homeowners brought several lawsuits against Davidson for construction defects (consolidated and referred to as the Allenson action). Davidson cross-complained against its subcontractors, including D. J., for express indemnity and negligence. Davidson, as ICW's additional named insured, tendered the defense of the Allenson action to ICW; it denied the request.

Davidson obtained counsel and settled some of the homeowners claims before trial.[2] The remaining homeowners claims were tried, and judgment was rendered in their favor. Golden Eagle, ICW and CIC, all of which defended D. J. on Davidson's cross-complaint, "paid a total of $305,000 to settle D. J.'s indemnity exposure to Davidson for damages paid" to the Allenson action plaintiffs.

D. J.'s obligation to indemnify Davidson for its attorney fees and costs in the Allenson action was submitted to binding arbitration. The arbitrator awarded Davidson $605,374.25. Golden Eagle and ICW paid the award in equal shares.

Davidson later sued ICW and several other insurers for declaratory relief, breach of contract, breach of the covenant of good faith and fair dealing and related counts (the Davidson action). Davidson alleged the insurers breached their duty to defend it in the Allenson action as an additional insured under policies issued to subcontractors, including D. J.

While the Davidson action was pending, Golden Eagle brought this action against ICW for declaratory relief, equitable contribution and equitable

---

[2] It is unclear whether Davidson retained counsel at its own expense, or other insurers defended it in the Allenson action.

indemnity. Golden Eagle sought reimbursement of the amount it paid toward the arbitration award, on the ground that ICW is solely responsible for Davidson's defense costs because it was an additional insured under the ICW policies. ICW cross-complained against CIC for equitable contribution and related counts.[3] ICW alleged that CIC, as D. J.'s insurer, is required to pay a portion of the arbitration award.

Subsequently, in the Davidson action, Davidson and the insurers entered into a settlement agreement under which they were required to pay Davidson a total of $66,500 in exchange for a release of all claims. ICW was required to pay $20,000 of that amount.

In this action, ICW and Golden Eagle filed summary judgment motions on the complaint, and ICW and CIC filed summary judgment motions on the cross-complaint. The trial court denied ICW's motions and granted Golden Eagle's and CIC's motions. The court found that Davidson's defense costs in the Allenson action are not "damages" within the meaning of the CGL policies, and thus D. J.'s liability for such costs under the indemnity agreements is not covered. The court determined that ICW breached its obligation to defend Davidson as an additional insured, and thus "in equity and good conscience ICW should reimburse [Golden Eagle]" for its payment of one-half of the arbitration award against D. J. In May 2001, judgments were entered in favor of Golden Eagle and CIC on the complaint and cross-complaint, respectively.

DISCUSSION

I

*Standard of Review*

■ Summary judgment is proper only where there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) "On appeal, this court exercises its independent judgment in determining whether there are no triable issues of material fact and the moving party thus is entitled to judgment as a matter of law." (*Sanchez v. Swinerton & Walberg Co.* (1996) 47 Cal.App.4th 1461, 1466 [55 Cal.Rptr.2d 415].)

---

[3]CIC was erroneously named in the cross-complaint as Orion Insurance Company. Golden Eagle and another insurer were also named in the cross-complaint, but those claims are not at issue on appeal.

## II

### *Indemnitee's Defense Costs as "Damages" Under CGL Policies*

#### A

■ ICW contends the judgments must be reversed because (1) contractual liability provisions of the CGL policies of Golden Eagle, CIC and ICW cover D. J.'s liability for Davidson's defense costs in the Allenson action, and the three insurers should contribute equally to satisfying the arbitration award; and (2) since the policies cover D. J.'s exposure for the loss, there is no equitable ground for shifting the entire burden to ICW as Davidson's insurer under the additional insured endorsements of the ICW policies.

■ "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply. [Citation.]" (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545].) "The goal of contract interpretation is to give effect to the mutual intent of the parties. [Citation.] If contract language is clear and explicit, we ascertain this intent from the written provisions and go no further. [Citation.] Words in an insurance policy must be understood in their ordinary sense unless given special meanings by the policy. [Citation.]" (*Maryland Casualty Co. v. Nationwide Ins. Co.* (1998) 65 Cal.App.4th 21, 28 [76 Cal.Rptr.2d 113].)

■ "A ' "policy provision is ambiguous when it is capable of two or more constructions both of which are reasonable." ' [Citation.] An ambiguity is resolved by interpreting the provision in the sense the promisor (i.e., the insurer) believed the promisee understood it at the time of contract formation. [Citation.] 'This rule . . . protects not the subjective beliefs of the insurer but, rather, "the objectively reasonable expectations of the insured." ' [Citation.] If these rules do not eliminate the uncertainty, a court must construe the applicable language against the drafter who created the uncertain language. [Citation.]" (*Maryland Casualty Co. v. Nationwide Ins. Co.,* *supra,* 65 Cal.App.4th at pp. 28-29; *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619].) Ambiguities in insurance contracts are generally construed in favor of coverage. (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253].)

#### B

■ Golden Eagle's and CIC's policies cover all sums that the insured becomes "legally obligated to pay as *damages* because of . . . 'bodily

injury' or 'property damage' " caused by an " 'occurrence,' " or accident. (Italics added.) The policies also provide contractual liability coverage. The Golden Eagle policies state:

"2. **Exclusions.**

"This insurance does not apply to: [¶] . . . [¶]

"b. 'Bodily injury' or 'property damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

"(1) Assumed in a contract or agreement that is an 'insured contract', provided the 'bodily injury' or 'property damage' occurs subsequent to the execution of the contract or agreement; or

"(2) That the insured would have in the absence of the contract or agreement."

The Golden Eagle policies define " 'insured contract' " as "[t]hat part of any other contract or agreement pertaining to your business . . . under which you assume the tort liability of another party to pay for . . . 'property damage' to a third person or organization."[4]

The CIC policies exclude coverage "to liability assumed by the insured under any contract or agreement except a contract as defined" in the policies. The CIC policies define a covered contract as "any written contract or agreement wherein the named insured has expressly assumed liability for damages to which this policy applies."

Under the subcontracts here, D. J. expressly assumed the tort liability of Davidson for property damage claims of third persons. Accordingly, the subcontracts are insured contracts within the meaning of the CGL policies. "If there is a single key factor or element on which to focus when trying to determine whether a contract is an insured contract, it is the insured's

---

[4]The Golden Eagle policies are on standard forms published by the Insurance Services Office, Inc. (ISO) in 1988. The ISO "is a non-profit organization that provides rating, statistical, and actuarial policy forms and related services to all American property or casualty insurers. ISO is currently responsible for policy revisions on a nationwide basis. The basic ISO policy forms often are modified, sometimes extensively, by individual insurers. As a result, there really is no such thing as a standard general liability form in California. However, most companies use the basic ISO forms at least as the starting point for their general liability policies." (4 Cal. Insurance Law and Practice (1999) § 49.04[2], p. 49-9.)

assumption of liability under the contract at issue." (Richmond & Black, *Expanding Liability Coverage: Insured Contracts and Additional Insureds* (1996) 44 Drake L.Rev. 781, 787.) "[T]he insured must assume the other contracting party's tort liability to third parties in order for insured contract coverage to attach." (*Id.* at p. 784.)

ICW contends that given the contractual liability coverage, the policies should be interpreted to include Davidson's defense costs in the Allenson action as sums D. J. became "legally obligated to pay as *damages* because of" property damage. (Italics added.) Golden Eagle and CIC counter that the defense costs are not covered because the policies' definitions of insured contract refer only to the assumption of *tort* liability and do not expressly include the assumption of defense costs. Golden Eagle and CIC assert that the terms of the indemnity agreements between Davidson and D. J. are immaterial.

Apparently, there is no published California opinion on point. ICW relies on an August 1996 Fire Casualty & Surety Bulletin (FC & S bulletin), which provides:

"There has been a question in some circles over whether the contractual coverage offered under the CGL form *extends defense cost coverage to the entity whose liability has been assumed by the insured through an insured contract. . . .*

"The current CGL form, in discussing liability for damages assumed under an insured contract, states that 'reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages'. *This would seem to answer the question in the affirmative since the word 'damages' is the key word.* The exception to the contractual liability exclusion states that the exclusion does not apply to liability for 'damages' assumed under an insured contract; therefore, if the defense costs for the entity other than the insured are 'damages', the CGL form will cover them. There are some conditions to be met before the defense costs are deemed to be damages, namely, liability for the defense costs has to be assumed in the insured contract (just as the liability has to be assumed), and the defense costs have to be for defense against alleged damages that are covered by the insured's policy." (Italics added.)[5]

■ The FC & S bulletin, which is published by the National Underwriters Association, is used by insurance agents and brokers to interpret standard

---

[5]The current CGL form reads: " 'Solely for the purposes of liability assumed in an "insured contract," reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property

insurance policy provisions. (*Maryland Casualty Co. v. Reeder* (1990) 221 Cal.App.3d 961, 972 [270 Cal.Rptr. 719].) "[R]eliance on [an] FC & S bulletin is appropriate under Civil Code section 1645 which provides: 'Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense.' " (*Maryland Casualty Co. v. Reeder, supra,* at p. 973, fn. 2; *American Star Ins. Co. v. Insurance Co. of the West* (1991) 232 Cal.App.3d 1320, 1331 & fn. 8 [284 Cal.Rptr. 45].) "[I]nsurance industry publications are particularly persuasive as interpretive aids where they support coverage on behalf of the insured. Ultimately, the test is whether coverage is 'consistent with the insured's objectively reasonable expectations.' [Citation.]" (*Prudential-LMI Commercial Ins. Co. v. Reliance Ins. Co.* (1994) 22 Cal.App.4th 1508, 1512-1513 [27 Cal.Rptr.2d 841].)

██ The FC & S bulletin does indicate that the current CGL form *clarifies* coverage that existed under previous versions of the form, rather than extends a new type of coverage. The question addressed in the FC & S bulletin would not have been based on the *current* CGL form, because it expressly includes defense costs. Indeed, the insurers do not contend otherwise. Rather, Golden Eagle objects to our consideration of the FC & S bulletin on the ground that its policies unambiguously exclude coverage for Davidson's defense costs, and thus resort to interpretive aids is improper. We disagree. The term "damages" as used in the insuring clauses of the Golden Eagle and CIC policies is not defined, and given the contractual liability coverage of the policies, the term could reasonably be interpreted to include the indemnitee's costs in defending against third party claims for covered property damages.

Opinions from other jurisdictions on the scope of contractual liability coverage, though few, are informative. ICW cites *R.W. Beck & Assoc. v. City and Borough of Sitka* (9th Cir. 1994) 27 F.3d 1475 (*Beck*), in which the court interpreted Alaska law. In *Beck*, the policies provided the insurers "will pay on behalf of the Insured all sums which the Insured, by reason of contractual liability assumed by him under any written contract of the type designated in the schedule for this insurance, shall become legally obligated to pay as

damage," provided: [¶] (a) Liability to such party for, or for the costs of that party's defense has also been assumed in the same "insured contract"; and [¶] (b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.' [Citation.]" (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2001) ¶ 7:1475, p. 7E-26.) "Because defense costs assumed by the insured are covered as 'damages,' they reduce indemnity limits on all claims covered by the policy (whereas defense costs are *in addition to* indemnity limits)." (*Id.* at ¶ 7:1475.1, p. 7E-27.)

damages *because of* [¶] *bodily injury or* [¶] *property damage to which this insurance applies,* caused by an occurrence." (*Id.* at pp. 1484-1485, fn. 14, italics added.) This language is substantively similar to that of the Golden Eagle and CIC policies.

The insured in *Beck* (Sitka), the owner of a dam, had entered into an agreement to indemnify a contractor (Beck) for damages, including costs of defense, related to any personal injuries or death arising from services Beck performed on the dam. (*Beck, supra,* 27 F.3d at p. 1484.) The court held that attorney fees and costs Beck incurred in defending against a wrongful death action were " 'damages' " covered under the contractual liability provisions of Sitka's policy, as opposed to " 'costs' " covered by supplementary payment provisions, which applied to " 'costs taxed against [the insured] in any suit defended by' " the insurer. (*Ibid.*) The court explained the defense costs constituted covered " 'damages' " because they were "awarded to Beck by virtue of the broadly-worded indemnity provision in the service contract between Beck and Sitka." (*Ibid.*)

Golden Eagle and CIC attempt to distinguish *Beck* on the grounds that there the contractual liability provisions appeared in endorsements rather than the body of the policies, and the insured paid an additional premium for the coverage. The insurers, however, cite no authority suggesting the interpretation of policy language is dependent on the location in which it appears or the cost of coverage. ■ "Where a point is merely asserted by counsel without any argument of or authority for its proposition, it is deemed to be without foundation and requires no discussion." (*People v. Ham* (1970) 7 Cal.App.3d 768, 783 [86 Cal.Rptr. 906], disapproved of on another ground in *People v. Compton* (1971) 6 Cal.3d 55, 60, fn. 3 [98 Cal.Rptr. 217, 490 P.2d 537]; *People v. Sierra* (1995) 37 Cal.App.4th 1690, 1694, fn. 2 [44 Cal.Rptr.2d 575].) ■ In any event, the insured's objectively reasonable expectations cannot ordinarily be gleaned from the premium cost alone. (See *Maryland Casualty Co. v. Nationwide Ins. Co., supra,* 65 Cal.App.4th at p. 33.)

In *York v. Vulcan Materials Co.* (Tenn.Ct.App. 2001) 63 S.W.3d 384 (*York*), the definition of " 'insured contract' " was " '[t]hat part of any other contract or agreement pertaining to your business . . . under which you assume the *tort liability of another party to pay for* "*bodily injury*" *or* "*property damage*" *to a third person* or organization.' " (*Id.* at p. 387, italics added.) This language is identical to that of the Golden Eagle policies and substantively similar to that of the CIC policies. A subcontract between the insured subcontractor (Thomas) and the contractor (Vulcan) required Thomas to indemnify Vulcan for any damages or losses, including attorney fees,

arising from Thomas's negligence. The court held the subcontract was an " 'insured contract' " within the policy's meaning, and the insurer was required to pay the defense costs Vulcan incurred in an underlying personal injury action allegedly caused by Thomas's negligence. (*Id.* at pp. 387-388; see also *Ryland Mortgage Co., Inc. v. Travelers Indem. Co.* (D.Md. 2001) 177 F.Supp.2d 435, 437 [no dispute that contractual liability coverage extended to indemnitor's defense costs, notwithstanding fact that provision did not expressly include defense costs].)

According to a commentator, when a policy is "written to cover liability [of the insured] imposed by contract," "[w]hether an insurer is obligated under its policy to indemnify its insured *depends on the indemnification or hold-harmless agreement executed by its insured.*" (7A Appleman, Insurance Law and Practice (Berdal ed. 1979) § 4497.02, p. 128, italics added.) Appleman states that a "contract of indemnification of a contractor by a subcontractor does not bind the subcontractor's insurer to defend a liability action against the contractor, but merely to indemnify the general contractor for liability sustained. However, liability incurred by an owner [indemnitee] has included attorney fees, costs, discovery and research expenses in the successful defense of the main action." (*Id.* at p. 129, fns. omitted, citing *Williams v. California Company* (E.D.La. 1968) 289 F.Supp. 376, 379 ["The obligation of an independent contractor to defend, hold harmless and indemnify its principal, under [insured] contracts includes reimbursement of litigation expenses"; " 'Reasonable counsel fees which have been incurred in resisting the claim indemnified against may be recovered [from indemnitor's insurer] as a part of the *damages* and expenses when an action is brought to recover indemnity either upon a right of indemnity implied by law or arising under a contract.' [Citation.]"].) (*Williams v. California Company, supra,* at p. 380, italics added.)

In California, the plain and ordinary meaning of the term "damages," as used in CGL policies, is monetary compensation recovered by a party for "detriment," "loss" or "injury" it has suffered through the acts of another. (See *AIU Ins. Co. v. Superior Court, supra,* 51 Cal.3d at pp. 825-826; Civ. Code, § 3281.[6]) Golden Eagle and CIC rely on *Cutler-Orosi Unified School Dist. v. Tulare County School etc. Authority* (1994) 31 Cal.App.4th 617 [37 Cal.Rptr.2d 106] (*Cutler-Orosi*), for the proposition that Davidson's attorney fees are not damages within the meaning of the policies. In *Cutler-Orosi,* the court held that the plaintiff's attorney fees, for which the defendant school

[6]Civil Code section 3281 provides: "Every person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages."

districts were liable under the federal Voting Rights Act of 1965, did not qualify as damages under the districts' liability policy. The court explained that "an award of attorney fees . . . 'does not compensate the plaintiff for the injury that first brought him [or her] into court[;] [i]nstead, the award reimburses him [or her] for a portion of the expenses he [or she] incurred in seeking . . . relief,' " and fees "are inconsistent with the concept of 'damages' as the term is used in its ordinary and popular sense, that is, compensation paid to a party for the loss or detriment suffered because of the wrongful act of another. [Citation.]" (*Id.* at p. 632.)

*Cutler-Orosi* is inapposite, however, because it does not concern contractual liability provisions or the insured's assumption of liability for the indemnitee's costs in defending against covered third party tort actions. The same is true of other cases CIC cites in which the courts held that intangible damages, including economic losses, of third party plaintiffs are not within the scope of CGL policies. (*Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at pp. 26-27; *McLaughlin v. National Union Fire Ins. Co.* (1994) 23 Cal.App.4th 1132, 1150 [29 Cal.Rptr.2d 559]; *Chatton v. National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 846, 857-858 [13 Cal.Rptr.2d 318]; *Giddings v. Industrial Indemnity Co.* (1980) 112 Cal.App.3d 213, 219 [169 Cal.Rptr. 278].)

■ "[C]ourts should construe 'insured contract' provisions broadly, in favor of coverage." (*Ryland Mortgage Co., Inc. v. Travelers Indem. Co., supra,* 177 F.Supp.2d at p. 439, quoting *Mid-Continent Cas. Co. v. Swift Energy Co.* (5th Cir. 2000) 206 F.3d 487, 492-493.) In determining the insured's objectively reasonable expectations of coverage, " 'the disputed policy language must be examined *in context* with regard to its intended function in the policy. [Citation.] This requires a consideration of the policy as a whole, the circumstances of the case . . . and "common sense." [Citation.]' [Citation.] These rules apply in determining the existence of an ambiguity and in resolving the conflict once an apparent ambiguity has been identified. [Citations.]" (*Maryland Casualty Co. v. Nationwide Ins. Co., supra,* 65 Cal.App.4th at p. 30.)

■ We conclude that an insured with contractual liability coverage would reasonably expect that the indemnitee's attorney fees and costs are sums the insured becomes "legally obligated to pay as *damages* because of" covered tort claims. "[M]ost construction agreements or contracts require downstream contractors or subcontractors to protect upstream contractors" by way of indemnity provisions, (Richmond & Black, *Expanding Liability Coverage: Insured Contracts and Additional Insureds, supra,* 44 Drake

L.Rev. at p. 790) and many indemnification clauses in the construction industry "include language that can be read to require a defense as well as indemnity." (*Id.* at p. 793.) Indeed, in California an indemnity against claims and liability "embraces the costs of defense against such claims" unless "a contrary intention appears." (Civ. Code, § 2778, subd. 3.)

Moreover, it is established that the indemnitee's attorney fees constitute an "item of damages" for the indemnitor's breach of its indemnity obligation. (*Heppler v. J.M. Peters Co., supra,* 73 Cal.App.4th at p. 1293; *Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 973 [17 Cal.Rptr.2d 242] [indemnitee's attorney fees included "as a matter of law as an item of recoverable loss in an indemnity agreement"].) Davidson suffered "detriment" or "loss" by incurring attorney fees and costs as a direct result of third party claims for property damage arising from D. J.'s work, and the arbitration award on the indemnity agreement is monetary compensation therefor.

Further, it is recognized that "construction defect litigation is typically complex and expensive." (*Maryland Casualty Co. v. Nationwide Ins. Co., supra,* 65 Cal.App.4th at p. 33; *Pardee Construction Co. v. Insurance Co. of the West* (2000) 77 Cal.App.4th 1340, 1361 [92 Cal.Rptr.2d 443].) As a matter of common sense, protection from potentially ruinous defense costs of the indemnitee is as vital to an insured as protection from the indemnitee's tort liability. Here, for instance, Davidson's defense costs in the Allenson action exceeded its tort liability for work attributable to D. J. by nearly 200 percent. Notably, the FC & S bulletin shows that the insurance industry believed that when an insured contract includes the assumption of the indemnitee's attorney fees and costs, such expenses are covered "damages" according to the reasonable expectations of the insured.[7]

---

[7]Because the indemnity agreements here expressly required D. J. to pay Davidson's attorney fees and costs in a third party tort action, we are not required to decide whether contractual liability provisions of CGL policies cover the indemnitee's defense costs when the indemnity agreements do not expressly refer to the assumption of defense costs.

Further, given our holding we are not required to address ICW's alternative position that the arbitration award *may* have included attorney fees Davidson incurred in pursuing indemnity against D. J., and that portion of fees is covered by "supplementary payment" provisions of the policies. We also note that neither Golden Eagle nor CIC asserts the arbitration award included attorney fees other than those Davidson incurred in the Allenson action. (See *Otis Elevator Co. v. Toda Construction* (1994) 27 Cal.App.4th 559, 564 [32 Cal.Rptr.2d 404] [provision including attorney fees as item of loss in indemnity clause is not provision for attorney fees in action to enforce contract].)

## III

### *Equitable Contribution Issues*

#### A

 In the insurance context, the "right to contribution depends upon the existence of an obligation owed to a common insured. The right arises when one of two or more insurers is '*obligated to indemnify or defend*' the same loss or claim and one of those insurers has paid more than its share of the loss or defended the action without participation from the others. [Citation.] 'Equitable contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory that the debt it paid was *equally and concurrently owed* by the other insurers and should be shared by them pro rata in proportion to their respective coverage of the risk. The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others. [Citations.]' [Citation.]" (*American Continental Ins. Co. v. American Casualty Co.* (2001) 86 Cal.App.4th 929, 937 [103 Cal.Rptr.2d 632], citing *Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1293-1294 [77 Cal.Rptr.2d 296].)

 ICW contends there is no equitable basis for charging ICW with the arbitration award as Davidson's insurer under the additional insured endorsements of its policies, particularly since the ICW, Golden Eagle and CIC policies cover D. J.'s liability for the arbitration award. We agree. The three insurers are obligated to indemnify a common insured—D. J.—for the loss. On the other hand, under the additional insured endorsements, ICW provided coverage for another insured—Davidson. Courts have enforced an insurer's contribution claim only when the other insurer was also obligated to a common insured on the claim. "[W]here there is no common obligation that is legally due from multiple insurers, then no basis for contribution exists." (*American Continental Ins. Co. v. American Casualty Co., supra,* 86 Cal.App.4th at p. 938, italics omitted.)

 Golden Eagle points out that an additional insured is entitled to a defense from the insurer (*Pardee Construction Co. v. Insurance Co. of the West, supra,* 77 Cal.App.4th at p. 1345), and ICW breached its duty to defend Davidson in the Allenson action. Golden Eagle asserts that because of the breach, "the entire arbitration award . . . must be paid by ICW [as] Davidson's insurer." Golden Eagle, however, offers no supporting authority, so we may treat the point as waived or meritless. (*Troensegaard v. Silvercrest Industries, Inc.* (1985) 175 Cal.App.3d 218, 228 [220 Cal.Rptr. 712].)

In any event, Golden Eagle's claim that equity requires ICW to pay the entire arbitration award as Davidson's insurer is based on the faulty premise that the CGL policies do not cover D. J.'s assumption of liability for Davidson's defense costs.

The trial court erred by granting Golden Eagle's motion for summary judgment and entering judgment for it on the complaint. Instead, ICW is entitled to judgment on the complaint.

B

Because Golden Eagle, CIC and ICW insured D. J.'s risk, ICW is entitled to equitable contribution from CIC, which refused to pay any portion of the arbitration award. The court thus erred by granting CIC's motion for summary judgment and entering judgment for it on ICW's cross-complaint.

The remaining issue is whether ICW was entitled to judgment on the cross-complaint as a matter of law. ■ A "party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he [or she] is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].) A plaintiff or cross-complainant satisfies this burden by "prov[ing] each element of the cause of action entitling the party to judgment on that cause of action." (Code Civ. Proc., § 437c, subd. (*o*)(1).)

■ There is no single method of allocating defense or indemnity costs among coinsurers. "The reason for the courts' refusal to establish such a bright-line rule is the existence of differing factual circumstances varying from case to case, which unavoidably give rise to different equitable considerations that must be taken into account." (*Centennial Ins. Co. v. United States Fire Ins. Co.* (2001) 88 Cal.App.4th 105, 116 [105 Cal.Rptr.2d 559].) "[T]he courts in California have consistently held that trial courts must maintain equitable discretion to fashion a method of allocation suited to the particular facts of each case and the interests of justice, subject to appellate review for abuse of that discretion." (*Ibid.*)

■ Courts have adopted several methods of allocation, including the following: "(1) apportionment based upon the relative duration of each primary policy as compared with the overall period of coverage during which the 'occurrences' 'occurred' (the 'time on the risk' method) [citations]; (2) apportionment based upon the relative policy limits of each primary policy (the 'policy limits' method) [citations]; (3) apportionment

based upon *both* the relative durations and the relative policy limits of each primary policy, through multiplying the policies' respective durations by the amount of their respective limits so that insurers issuing primary policies with higher limits would bear a greater share of the liability per year than those issuing primary policies with lower limits (the 'combined policy limit time on the risk' method) [citation]; (4) apportionment based upon the amount of premiums paid to each carrier (the 'premiums paid' method) [citation]; (5) apportionment among [the] carrier[s] in equal shares up to the policy limits of the policy with the lowest limits, then among [the] carrier[s] other than the one issuing the policy with the lowest limits in equal shares up to the policy limits of the policy with the next-to-lowest limits, and so on in the same fashion until the entire loss has been apportioned in full (the 'maximum loss' method) [citation]; and (6) apportionment among [the] carrier[s] in equal shares (the 'equal shares' method) [citation]." (*Centennial Ins. Co. v. United States Fire Ins. Co., supra,* 88 Cal.App.4th at pp. 112-113.)

■ In its moving papers, ICW produced evidence that it insured D. J. for four years, and CIC and Golden Eagle each insured D. J. for two years, and Golden Eagle and ICW each paid one-half of the $605,374.25 arbitration award. ICW submitted no other evidence bearing on the method of allocation. Further, it presented no legal authorities on any particular method of allocation and sought no specific amount of contribution from CIC. Rather, ICW merely argued "the entire [arbitration] [a]ward is owed by the three carriers."

However, in a supplemental letter brief to the trial court, ICW argued: "The Court, in its equitable powers, can simply divide the defense obligation by 8, based on there being eight one-year policies at issue in this case (consistent with the percentages used between them for the settlement payment made on the homeowners claims). ICW issued four . . . of those policies; [Golden Eagle] and CIC each issued two . . . of those policies. ICW has already paid 50% of the award. [Golden Eagle] paid 50% and CIC paid nothing. Alternatively, the Court could divide the [defense] expenses by the number of carriers (as [Golden Eagle] and ICW did when they funded the [arbitration] [a]ward), in the present circumstance, 1/3rd each. [¶] As between the Carriers and their obligations for the [arbitration] [a]ward, there is no superior equity in any particular carrier."

The appellate record contains no response from CIC or Golden Eagle regarding ICW's proposed methods of allocation. Further, the court did not reach the allocation issue because it denied ICW's motion for summary judgment on the cross-complaint on the ground that the arbitration award did

not constitute "damages" within the meaning of the CGL policies. Under the circumstances, we remand the matter to the trial court for its reconsideration of ICW's motion, and exercise of discretion in determining whether ICW submitted sufficient evidence to support a particular method of allocation, and if so, the amount CIC must contribute.[8]

## DISPOSITION

The judgment for Golden Eagle on the complaint is reversed; the judgment for CIC on the cross-complaint is reversed. The matter is remanded to the trial court for its entry of an order granting ICW's motion for summary judgment on the complaint and judgment thereon, and reconsideration of its denial of ICW's motion for summary judgment on the cross-complaint. ICW is awarded costs on appeal from Golden Eagle and CIC.

McIntyre, Acting P. J., and O'Rourke, J., concurred.

---

[8]We note that apportionment of the arbitration award is complicated by the fact that Golden Eagle has not sought equitable contribution from CIC.