Filed 12/27/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| NAVIGATORS SPECIALTY INSURANCE COMPANY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> MOOREFIELD CONSTRUCTION, INC., <br><br> Defendant and Appellant. | G050759 <br><br> (Super. Ct. No. 30-2011-00492111) <br><br> O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, David R. Chaffee, Judge.  Affirmed in part, reversed in part, and remanded.

Mahoney & Soll, Paul H. Mahoney, Richard A. Soll; Myers, Widders, Gibson, Jones & Feingold and Dennis Neil Jones for Defendant and Appellant.

Rutan & Tucker, Gerard M. Mooney, Jr., and Duke F. Wahlquist for Building Industry Legal Defense Foundation as Amicus Curiae on behalf of Defendant and Appellant.

Greenan, Peffer, Sallander & Lally, Robert L. Sallander, Jr., and Robin L. Thornton for Plaintiff and Respondent.

\*         \*         \*

# INTRODUCTION

Navigators Specialty Insurance Company (Navigators) issued commercial general liability (CGL) insurance policies (the Policies) to Moorefield Construction, Inc. (Moorefield), a licensed general contractor. In this appeal, we address the meaning, scope, and application of two standard provisions of the Policies. The first is the coverage A section, which provides that the insurance applies to property damage caused by an "occurrence," defined to mean an "accident." The second is the supplementary payments provision, which requires the insurer to pay "[a]ll costs taxed against the insured" in any lawsuit the insurer defends on behalf of the insured.

Moorefield appeals from a judgment in favor of Navigators, entered in a lawsuit in which Navigators sought a declaration of its rights and duties under the Policies. Navigators's lawsuit was corollary to construction defect litigation arising out of the construction of a building to be used as a Best Buy store in Visalia, California. Moorefield was the general contractor for the construction of the building. Moorefield and the developer, D.B.O. Development No. 28 (DBO), entered into a construction contract. Several years after the construction was completed, the owner of the building, JSL Properties, LLC (JSL), sued Moorefield and DBO for breach of the construction contract and negligence based on claims the flooring had failed. DBO filed a cross-complaint against Moorefield and various subcontractors for indemnity. Navigators accepted Moorefield's tender of defense of JSL's complaint and DBO's cross-complaint, subject to a reservation of rights.

During the course of litigation, evidence obtained in discovery showed the most likely cause of the flooring failure was that flooring tiles had been installed on top of a concrete slab that emitted moisture vapor in excess of specifications. Evidence also showed that Moorefield knew of the results of two tests showing excessive moisture vapor emission from the concrete, yet had directed the flooring subcontractor to install

the flooring anyway. Evidence also established the cost to repair the flooring was $377,404.

The litigation settled for a total settlement sum of $1,310,000. JSL received $885,000 while DBO received $425,000. On Moorefield's behalf, Navigators contributed its policy limits of $1 million toward the settlement. Moorefield independently contributed an additional $150,000. The remaining $160,000 was made up of contributions from Best Buy Stores, LP (Best Buy), and the defendant subcontractors.

In the meantime, Navigators filed this lawsuit seeking a declaration it had no duty under the Policies to defend or indemnify Moorefield. Navigators contended the flooring failure was not a covered occurrence under the Policies because it was not the result of an accident.

Following a bench trial, the trial court found there was no covered occurrence under the Policies because Moorefield had directed the flooring subcontractor to install the flooring despite Moorefield's knowledge that moisture vapor emission from the concrete slab exceeded specifications. The trial court found that Moorefield had not met its burden of proving what portion, if any, of the $1 million paid by Navigators came within the supplementary payments provision of the Policies. The trial court also found that Navigators had no duty to make payments under the supplementary payments provision because Moorefield's liability arose from a noncovered claim. The judgment requires Moorefield to reimburse $1 million to Navigators.

Moorefield's appeal raises two primary issues, one related to the coverage A provision of the Policies and the other related to the supplementary payments provision of the Policies. These two issues are addressed, respectively, in parts I and II of the Discussion section.

*Issue I: Was the Flooring Failure a Covered Occurrence Within the Meaning of the Policies?* No. The Policies define "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful

3

conditions." Under California law, "[a]n accident does not occur when the insured performs a deliberate act unless some additional, unexpected, independent, and unforeseen happening occurs that produces the damage." (*Fire Ins. Exchange v. Superior Court* (2010) 181 Cal.App.4th 388, 392 (*Fire Ins. Exchange*), citing *Merced Mutual Ins. Co. v. Mendez* (1989) 213 Cal.App.3d 41, 51.) The most likely cause of the flooring failure was moisture vapor emitted from the concrete slab. We conclude Moorefield's conduct was not an accident because it was a deliberate decision made with knowledge that the moisture vapor emission rate from the concrete slab exceeded specifications. The damage was not produced by an additional, unexpected, independent, and unforeseen happening.

Navigators therefore had no duty to indemnify Moorefield and was entitled to recoup that portion of the $1 million paid toward settlement that was attributable to damages.

*Issue II: Does the Supplementary Payments Provision Apply to Any Portion of the $1 Million Paid Toward Settlement by Navigators?* Yes. A supplementary payments provision in a CGL policy includes attorney fees when they are or would be taxable as costs against the insured. That would include, for example, prevailing party attorney fees under a contract. The construction contract between Moorefield and DBO had such an attorney fees provision. Supplementary payments are tied to an insurer's duty to defend, not the insurer's duty to indemnify. Here, the evidence established that Navigators had a duty to defend Moorefield at the time of the settlement because there was a potential for coverage of the claim that Moorefield was responsible for the flooring failure. Although the trial court found, in effect, that Navigators had no duty to defend, that finding was not retroactive to the time of the settlement.

Thus, Navigators had a duty to compensate Moorefield under the supplementary payments provision of the Policies. That duty was not extinguished by the determination that Navigators had no duty to indemnify.

4

The trial court found that Moorefield did not prove by a preponderance of the evidence what portion, if any, of the $1 million settlement payment was attributable to supplementary payments. Navigators, however, bore the burden of proof on that issue. The trial court erred by misallocating the burden of proof to Moorefield. The trial court's error was prejudicial because substantial evidence does not support an implied finding that all of the $1 million paid by Navigators was for damages and none was for supplementary payments. The evidence established conclusively that the cost of repair damages was $377,404.

As a result, we conclude Moorefield must reimburse Navigators only for the portion of the $1 million paid by Navigators that is attributable to damages. Moorefield may keep that portion of the $1 million paid by Navigators that is attributable to the supplementary payments provision of the Policies. We therefore affirm in part, reverse in part, and remand for a new trial limited to the issue of the amount of the $1 million paid by Navigators that is attributable to damages, not attorney fees and costs of suit under the supplementary payments provision.

## FACTS

## I.

## The Policies

Moorefield is a licensed general contractor specializing in the construction of shopping centers, movie theaters, and commercial and retail buildings. The Policies issued by Navigators to Moorefield were effective from April 1, 2002 to April 1, 2003. The Policies were renewed annually to April 1, 2006. There is no material difference in language in the Policies.

In coverage A, "Bodily Injury and Property Damage Liability," the Policies provide: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those

damages."  The Policies state:  "This insurance applies to 'bodily injury' and 'property damage' only if:  [¶] . . . The 'bodily injury' or 'property damage' is caused by an '*occurrence*' that takes place in the 'coverage territory.'"  (Italics added.)  The Policies define "occurrence" to mean "*an accident*, including continuous or repeated exposure to substantially the same general harmful conditions."  (Italics added.)

The Policies include a supplementary payments provision providing that Navigators will pay "[a]ll costs taxed against the insured" in any lawsuit Navigators defends on behalf of the insured.

## II.

### Contracts, Plans, and Specifications for Construction of the Best Buy Building

Between 2002 and 2004, DBO developed the Packwood Creek East Regional Shopping Center project in Visalia, California.  In 2003, DBO engaged Moorefield to act as the general contractor for the shopping center project, which was to include the construction of a 30,055-square-foot building to be used as a Best Buy store (the Best Buy Building).  In January 2002, DBO entered into a 15-year lease with Best Buy.

DBO and Moorefield entered into an owner-contractor agreement dated April 30, 2003 (the Construction Contract) by which Moorefield agreed to act as general contractor on the Best Buy Building.  The scheduled completion date was August 22, 2003.  The Construction Contract provided that if Moorefield failed to complete the Best Buy Building on time, then Moorefield would pay $1,500 per day in liquidated damages for the first 30 days and $2,500 per day in liquidated damages thereafter.  Due to design changes, the scheduled completion date was extended to October 2003.

The plans and specifications for the Best Buy Building called for the installation of an interior concrete floor slab.  The "Project Manual for the Construction of the Best Buy Store Visalia, CA—BB-529" (the Project Manual) called for installation

6

of both vinyl composition tile (VCT) and carpet tile on top of the concrete slab.  Both the VCT's and the carpet tiles would be glued onto the concrete slab using a flooring adhesive.

Moorefield entered into a subcontract with R.H. Kiggins Construction, Inc. (Kiggins Construction), to install the concrete foundation and slab for the Best Buy Building, a subcontract with George Roofing to install the roof, and a subcontract with Solo Flooring, Inc. (Solo Flooring), to install the VCT's and carpet tiles.

## III.

### Moisture Vapor Emission from the Concrete Slab

Work on the Best Buy Building commenced in February 2003.  One of the early construction activities was the pouring of the interior concrete slab on grade that encompassed the entire footprint of the Best Buy Building.  The slab was about 30,055 square feet in area and was four inches thick.

Concrete slabs are porous and allow the emission of moisture vapor.  The Project Manual required Moorefield to "[e]nsure concrete floors are dry" and have a maximum moisture content of five pounds per 1,000 square feet.  This specification meant that before the VCT's were installed, the moisture vapor emitted from the surface of the concrete slab could not exceed five pounds of moisture vapor for every 1,000 square feet of surface.  The specification applied to the VCT's.  For the carpet tiles, the manufacturer's specifications of three, four, or five pounds per 1,000 square feet were used.  Jay Cote, Moorefield's project manager, testified that a moisture vapor emission rate of five pounds per 1,000 square feet was treated as the specification for both VCT and carpet tile.

The American Society for Testing and Materials has approved a standard test for measuring moisture vapor emission from concrete floors.  Designation: F 1869-98 states:  "Use this test method to obtain a quantitative value indicating the rate of moisture vapor emission from a concrete floor and whether or not that floor is acceptable to

7

receive resilient floor covering.[1] The moisture vapor emission rate only reflects the condition of the concrete floor at the time of the test.  All concrete subfloors emit some amount of moisture in vapor form.  Concrete moisture emission is a natural process driven by environmental conditions.  All floor coverings are susceptible to failure from excessive moisture vapor emissions."  (American Society for Testing and Materials, Standard Test Method for Measuring Moisture Vapor Emission Rate of Concrete Subfloor Using Anhydrous Calcium Chloride, Designation:  F 1869-98 (Aug. 1998) § 4.1.)

Moisture trapped between a concrete slab and a vapor retarder on the underside of floor tiles can cause flooring adhesive to deteriorate and "turn the glue to water."  The emulsified adhesive will "seep up in between the joints" of the VCT's and cause spider cracks in the tile.  The carpet tiles used at the Best Buy Building had a polyvinyl chloride backing that did not permit breathing, as would a "regular, normal glue down carpet."  The carpet tiles had a backing made of polyvinyl chloride which made them impermeable to the transmission of water or water vapor.  For that reason, moisture in the concrete slab could cause the glue used to adhere the carpet tiles to the slab to turn to liquid.

Moorefield hired Krazan & Associates (K & A) to conduct a series of moisture vapor emission tests for the concrete slab of the Best Buy Building.  K & A conducted the first series of tests from July 30, 2003 to August 2, 2003.  K & A conducted a second series of moisture vapor emission tests from August 15 to August 18, 2003.  All tests performed by K & A produced results exceeding the specification of five pounds per 1,000 square feet.  In a letter to Moorefield, dated August 6, 2003, K & A reported the results of the first series of tests were moisture vapor emission readings ranging from 7.42 to 9.48 pounds per 1,000 square feet.  In a letter to Moorefield, dated

---

[1]  "[R]esilient floor covering" means VCT.

8

August 25, 2003, K & A reported the results of the second series of tests were moisture vapor emission readings ranging from 6.6 to 8.8 pounds per 1,000 square feet. Another four to eight months of drying time were necessary for the concrete slab to cure sufficiently so that the moisture vapor emission rate would be under five pounds per 1,000 square feet.

## IV.

## The Decision to Install the Flooring

Cote, Moorefield's project manager, reviewed the test results from K & A. Cote, who had 40 years of experience, was not surprised by the results because moisture vapor emission rates exceeding specifications "happens all the time." He had been involved in other projects in which the moisture vapor emission rate exceeded the specification. In each of those projects, the flooring was laid down anyway, and no problem ensued. Cote believed there was "[l]ow risk to no risk" that flooring would fail if laid on a concrete slab with a moisture vapor emission rate of seven to nine pounds, when the specification was five pounds. In that situation, the decision was "not difficult" for Cote—"[i]t's always lay the floor."

Moorefield's president, Michael Moorefield, testified that between 1990 and 2000, Moorefield had been involved in about 50 construction projects in which concrete slabs were tested for moisture vapor emission. Of those 50, forty-nine had moisture vapor emission rates exceeding the required specification. In those situations in which the moisture vapor emission rate exceeded the specification, Michael Moorefield would speak with the owner, and it would be the owner's (or the tenant's) decision whether to lay the flooring. In each of those situations, Michael Moorefield was instructed to lay the flooring. In none of those situations did the flooring fail.

Cote's practice was to talk with the owner and other persons involved in the project if the moisture vapor emission rate exceeded the specification. The owner had the responsibility to decide whether to lay flooring over a concrete slab with a moisture vapor

9

emission rate exceeding the specification. Cote needed authorization to deviate from a specification. He explained: "The risk is there may be a problem . . . and there may not be. I've never had one, but, it's a specification. . . . [Y]ou have a specification. You're not meeting the specification. That's the problem. . . . I am going to deviate from that specification[,] I need your authority on that."

Cote discussed the matter of the moisture vapor emission rate test results with representatives of DBO and Best Buy sometime after August 25, 2003. Both DBO and Best Buy directed Cote to have the flooring installed ("[t]hey made a decision and . . . they said put it down"). The decision was based on a cost-benefit analysis: It would be cheaper to install the flooring immediately so that the Best Buy Building would be completed and the store open for holiday shopping, and to deal with flooring problems later.

Cote thereafter directed Solo Flooring to install the flooring. At the request of Solo Flooring, Cote signed a letter on behalf of Moorefield releasing Solo Flooring from any warranty claims. The letter, dated August 22, 2003, stated, "due to the high moisture of the above-mentioned job that there is no warranty for materials and that Solo Flooring, Inc. will not be held responsible for any moisture related problems." Cote described the letter as "boilerplate" that was presented whenever the moisture vapor emission rate exceeded specifications.

Solo Flooring installed the VCT's and carpet tiles in late August 2003, after receiving the signed letter from Moorefield. Construction of the Best Buy Building was substantially completed in late August 2003. The Best Buy store held its grand opening in October 2003.

## V.

### The Flooring Fails

Andres Vargas, a Best Buy mobile manager, noticed carpet tiles not sticking to the floor as early as the grand opening. The edges of the carpet tiles curled,

10

moisture and adhesive oozed through the edges, staining appeared at the edges, and odors were detected.   The problem was progressive and continuous starting in 2003.  Best Buy dealt with the problems by replacing failed tiles with extra tiles left at the site for repairs.

In 2009, Best Buy hired Dr. Rene Luft, an engineer with the consulting engineer firm of Simpson Gumpertz & Heger Inc., to investigate the flooring issues.  Luft inspected the Best Buy Building on March 17 and 18, 2009.  He saw curling and cupping of the edges of carpet tiles, staining at the edges of the carpet tiles from oozing adhesive, and spotting beneath the carpet tiles indicative of adhesive deterioration.  He looked for sources of moisture other than the concrete slab (such as roof leaks) and found none.  From lifting the tiles, it appeared to Luft that the problems were caused by moisture coming up from the slab.  He explained that alkalize in the concrete together with moisture caused the adhesive on the tiles to deteriorate.

Luft retained a firm to conduct a series of tests, including a moisture vapor emission rate test, a relative humidity test, and a pH test.  Based on the test results and his observations, Luft concluded and informed Best Buy that the cause of the flooring failure was moisture coming up from the concrete slab and the sand layer immediately beneath the slab.  Because a vapor retarder had been placed underneath the sand, and the backing on the carpet tiles was fairly impermeable, the only place for moisture trapped in the concrete and sand to go would be through the tile joints.  The vapor retarder placed below the sand had been "performing its function" of preventing moisture from seeping upward from the ground.  Thus, Luft concluded the moisture in the concrete slab "was there from the time that the concrete floor was cast" in 2003.

In March 2009, Best Buy notified DBO and JSL, which had purchased the Best Buy Building in 2004, by letter of the flooring issues.  Moorefield also received notice of flooring problems at the Best Buy Building.  JSL's owner, Jerry Baker, and his consultant, Roland Vierra, went to the Best Buy Building and there saw loose VCT's and

11

carpet tiles. After receiving notice, JSL, DBO, and Moorefield started an investigation into the potential source of the flooring issues, but did not make repairs.

In October 2009, Best Buy notified JSL that in 10 days Best Buy would exercise one of its remedies under the lease. Best Buy commenced repairs of the flooring. Those repairs included removing existing carpet tiles and VCT's, scraping off the adhesive, applying sealant, and installing new carpet tiles. Best Buy notified JSL that Best Buy would deduct repair costs from its monthly rental payments beginning on December 1, 2009. Best Buy completed the flooring repairs in November 2009 and, starting the next month, withheld about $377,404 from monthly rental payments. That amount included the labor and material costs to remove and replace the damaged flooring tiles throughout the Best Buy store.

## VI.

### The Underlying Litigation over the Flooring

In January 2010, JSL filed a complaint against Moorefield and DBO to recover the amounts withheld by Best Buy from rental payments. JSL later filed a first amended complaint and a second amended complaint. JSL asserted causes of action against Moorefield for breach of contract, negligence, breach of implied warranty, and declaratory relief.

DBO filed a cross-complaint and a first amended cross-complaint against Moorefield, Solo Flooring, Kiggins Construction, and George Roofing. DBO asserted 13 causes of action against Moorefield, including equitable indemnity under the Construction Contract, breach of contract, and express warranty, and asserted causes of action against Moorefield, Solo Flooring, Kiggins Construction, and George Roofing for equitable indemnity, implied contractual indemnity, contribution, negligence, and breach of implied warranty.

Moorefield tendered JSL's complaint and DBO's cross-complaint to Navigators, which accepted the tender, later made subject to a reservation of rights.

12

Navigators retained the law firm of Jacobson, Hansen, Najarian & McQuillan to represent Moorefield. Jason Decker and Jube Najarian of that law firm represented Moorefield until the conclusion of the case. Moorefield filed a cross-complaint against Solo Flooring, Kiggins Construction, and George Roofing.

In defending Moorefield, Decker explored various potential causes of the flooring failure, including roof leaks, plumbing leaks, water migrating up from below the concrete slab, and equipment use or movement of merchandise in the store. As the case progressed, Decker uncovered evidence of roof leaks. He concluded, however, that "[t]he leading candidate was moisture in the slab from original construction."

Following an unsuccessful mediation, Najarian prepared and sent to Navigators a status letter in which he wrote: "During the mediation, it became clear that a viable claim against George's Roofing is increasingly unlikely. First, there is substantial evidence demonstrating that George's recently replaced the original roof pursuant to a Manufacturer's Warranty. As a result, neither JSL nor Best Buy make any claim that there was significant roof leaks contributing to a moisture problem at the store. In fact, JSL makes no claims against George's Roofing whatsoever. [¶] Nor are we currently aware of any evidence that would establish a connection between the work done by George's Roofing and the alleged moisture problems in the Best Buy store."

During the litigation, JSL and DBO argued that Moorefield had "purged its records" to remove the results of the moisture vapor emission rate tests. Decker could not find the test reports in the documents produced by Moorefield. The absence of the test reports from those documents was significant to Decker in his evaluation of liability.

In a report to Navigators, Decker wrote: "Importantly, the Moorefield records regarding the actual construction work on the Best Buy facilities are completely devoid of any records regarding the 2003 moisture testing, the results of those tests, and the agreement with the flooring subcontractor to release it from any subsequent problems. Although Moorefield maintains its Job File which contains more than 4000 pages of

13

documents on the job, the Job File did not include the requests for moisture testing by Mr. Cote, the test results or the Agreement with the flooring subcontractor. All of those documents were obtained from the files of the other parties in this matter or as a result of subpoenas directed to third parties. The absence of these critical documents will have a substantial effect on the potential credibility of Moorefield and Jay Cote. In short, a jury is likely to question why Moorefield's voluminous files do not contain the critical moisture tests which were originally requested by Jay Cote. The opposing attorneys will argue that Moorefield removed the critical records from its files as part of an attempt to cover up its behavior during the construction process."

Ken Smith, the president of Solo Flooring, testified that Larry Moorefield telephoned him and asked what he remembered about the Best Buy job, "if there was any moisture test on it." During the telephone conversation, Larry Moorefield asked Smith to "lose the folder," which Smith interpreted to mean "destroy the folder."

## VII.

## Settlement of the Underlying Litigation

As damages, JSL sought property damage in the amount of $377,404 (which was the cost of labor and materials to make repairs) and attorney fees pursuant to the terms of the Construction Contract between DBO and Moorefield. DBO also sought attorney fees pursuant to the terms of the Construction Contract. Decker concluded, based on research and analysis, that both JSL and DBO would have the right to seek attorney fees under the Construction Contract.

The litigation settled in June 2013 for a settlement sum of $1,310,000. Of that amount, JSL received $885,000 while DBO received $425,000. On Moorefield's behalf, Navigators contributed its policy limits of $1 million. Moorefield independently contributed an additional $150,000. The remaining $160,000 was made up of contributions from Best Buy, Kiggins Construction, George Roofing, and Solo Flooring.

14

Decker testified that he believed at the time of the settlement, "it was more likely than not there would be a liability finding against Moorefield." The basis for that belief, Decker testified, was: "There was evidence which demonstrated that there was moisture coming from somewhere, and that it was causing problems with the flooring. There was an absence of evidence which pointed to causes other than the source of that moisture being the floor or the slab itself, with one substantial exception, which was the roof."

## PROCEDURAL HISTORY

Navigators filed this lawsuit seeking a declaration that it had no duty to defend or indemnify Moorefield under the Policies. A bench trial was conducted over six days in March 2014. At the close of trial, the court issued a tentative decision in favor of Navigators.

Moorefield requested a statement of decision. In July 2014, the trial court issued a statement of decision that included the following findings:

1. "The construction project, to build a Best Buy 'big box' store, came with a Project Manual (Exh. 6) that included specifications for the installation of floor coverings. In particular, the Project Manual specified: 'Ensure concrete floors are dry (maximum 5 lbs. Per 1000 s.f. moisture content), free of curing compounds and hardeners, and exhibit negative alkalinity, carbonization, or dusting.' Exh. 6-506. See also Exh. 6-510."

2. "Construction of this project commenced in February, 2003, and was completed October 22, 2003. Tests conducted by [K & A] . . . between 7-30-2003 and 8-2-2003, showed moisture content of the concrete slab to range between 7.42 and 9.48 lbs. Exh. 11."

3. "Some five to six years later the floor coverings, both carpet and vinyl began to fail as the adhesives released sufficient for pe[e]ling and separation of individual tiles and large areas of tiles. Prior to the underlying litigation, Best Buy hired Dr. Rene

15

Luft, P.E., to investigate the source of the flooring issues. Navigators subsequently hired Dr. Luft as its expert in this action. Testing in or about 2009 by Dr. Luft showed moisture content in the concrete ranging from 5.4 to 10.6 lbs. Exh. 18. Dr. Luft concluded, based upon his testing and his direct observation of the conditions on site that the failure of the floor coverings was directly caused by excessive concrete slab moisture from original construction."

4. "Opposing testimony from Geoffrey Hichborn, [Moorefield]'s expert engineer was to the effect that the failure of the floor coverings could be attributed to roof leaks resulting in water accumulating on the floor and migrating under the floor coverings. Mr. Hichborn did not directly observe or inspect the failed flooring at the Best Buy [B]uilding and based his opinions largely on criticisms of Dr. Luft's analysis and testing methodologies."

5. "In this instance, the Court finds the testimony of Dr. Luft to be entirely credible and reliable; indeed convincing and worthy of great weight. The Court finds Mr. Hichborn's testimony falls generally under the heading of mere speculation, and no weight was given to his opinions as to the cause of the flooring failure."

6. "The evidence shows that [Moorefield] was under a contractual obligation to deliver the completed structure to Best Buy by a date certain or face severe financial penalties for each day of delay. *See* Exh. 9. Testimony indicated the deadline for completion of construction may have been extended from August to October. In any case, the deadline loomed. Presented with this 'Hobson's choice,' [Moorefield] elected to take the risk of having the floor coverings installed immediately to allow for store opening in October rather than wait an extended period for the concrete to eliminate more of its moisture content. Indeed, Michael Moorefield, a principal of [Moorefield], testified that in his experience it is 'safe' to install these types of floor coverings despite the high moisture content as failures are rarely experienced."

16

7. "Under a reservation of rights Navigators provided a defense and ultimately paid the policy limit of $1,000,000 in settlement of Best Buy's lawsuit. In its investigation Navigators learned for the first time of the waiver and order to install the floor coverings over the moist concrete slab. Based in large part on this information, Navigators concluded that the floor coverings failure was no 'accident' within the terms or meaning of the policy of insurance it had issued to Moorefield. The Court agrees."

8. "[H]ad Navigators been in a position to know about the problematic installation of the floor coverings, it likely would have specifically excluded the coverings, or the failure thereof, from its policy. Instead, [Moorefield] elected to proceed with installation knowing that the moisture content exceeded design specifications and knowing that the installer required a waiver to do the installation. Under such circumstances, [Moorefield] cannot simply pass its liability on to an insurer whose policy contemplates compliance with product and construction design specifications."

9. "As relevant here, the supplementary payments provision obligates an insurer to pay costs taxed against its insured. The underlying case was settled and no costs were taxed against [Moorefield]. For purposes of this analysis, however, the Court will assume, without ruling on the legal issue, that costs included within a settlement are synonymous with 'costs taxed against the insured.'"

10. "[Moorefield] has not proven by a preponderance of the evidence what portion, if any, of Navigators' settlement payment was attributable to costs."

11. "Regardless, the obligation to pay the costs, if any, included within the settlement only arises where the obligation to pay costs arises from a potentially covered claim, which is not the case here. Rather, Moorefield's potential liability arose from a non-covered claim."

Judgment in favor of Navigators was entered in July 2014. The judgment was for $1 million plus about $68,274 in prejudgment interest. Moorefield brought a motion for a new trial and a motion to set aside and vacate the judgment, to amend and

17

correct the statement of decision, and to enter another and different judgment. The trial court denied both motions. This appeal followed.

## DISCUSSION

### I.

### Navigators Had No Duty to Indemnify Under the Policies Because the Flooring Failure Was Not a Covered Occurrence.

A. *Introduction and Background Law*

The trial court found that Navigators had no duty under the Policies to indemnify Moorefield because the flooring failure at the Best Buy Building was not the result of an accident. The coverage A section of the Policies states the insurance applies to bodily injury or property damage that "is caused by an 'occurrence.'" The Policies define "occurrence" to mean "*an accident*, including continuous or repeated exposure to substantially the same general harmful conditions." (Italics added.) The Policies thus provided coverage to Moorefield only if the property damage to the Best Buy Building was caused by an accident. The Policies do not define "accident," but California law does.

"In the context of liability insurance, an accident is '"an unexpected, unforeseen, or undesigned happening or consequence from either a known or an unknown cause."' [Citations.] 'This common law construction of the term "accident" becomes part of the policy and precludes any assertion that the term is ambiguous.' [Citations.]" (*Delgado v. Interinsurance Exchange of Automobile Club of Southern California* (2009) 47 Cal.4th 302, 308 (*Delgado*).)

"Under California law, the word 'accident' in the coverage clause of a liability policy refers to the conduct of the insured for which liability is sought to be imposed on the insured. [Citations]." (*Delgado*, *supra*, 47 Cal.4th at p. 311.) "An

18

accident does not occur when the insured performs a deliberate act unless some additional, unexpected, independent, and unforeseen happening occurs that produces the damage." (*Fire Ins. Exchange*, *supra*, 181 Cal.App.4th at p. 392; see *State Farm General Ins. Co. v. Frake* (2011) 197 Cal.App.4th 568, 579 (*Frake*).) An accident may exist if "'any aspect in the causal series of events leading to the injury or damage was unintended by the insured and a matter of fortuity.'" (*Frake*, *supra*, at p. 580.) However, "[w]here the insured intended all of the acts that resulted in the victim's injury, the event may not be deemed an 'accident' merely because the insured did not intend to cause injury." (*Fire Ins. Exchange*, *supra*, at p. 392.)

In *Frake*, the insured struck his friend, John King, in the groin while the two were engaged in horseplay. (*Frake*, *supra*, 197 Cal.App.4th at p. 571.) King sustained injuries and sued the insured, who tendered his defense to the insurer under a liability provision of a renter's policy. (*Ibid.*) The insurer sued the insured for a declaration regarding the duty to defend. (*Ibid.*) The Court of Appeal, reversing the trial court, held the insurer had no duty to defend because the insured engaged in an intentional act. (*Id.* at pp. 582-583.) The Court of Appeal confirmed that under *Delgado*, *supra*, 47 Cal.4th 302, "the term 'accident' does not apply where an intentional act resulted in unintended harm." (*Frake*, *supra*, at p. 582.)

In *Fire Ins. Exchange*, the insureds intentionally constructed a home that extended across the property line under the mistaken belief they owned a five-and-one-half-foot strip of land and had the legal right to build on it. (*Fire Ins. Exchange*, *supra*, 181 Cal.App.4th at pp. 390, 396.) Faced with a lawsuit for quiet title, declaratory relief, and fraud, the insureds tendered defense to their insurer under a homeowners policy. (*Id.* at p. 391.) After the insurer refused to defend on the ground there was no potential for coverage, the insureds sued for breach of contract and bad faith. (*Ibid.*) The trial court denied the insurer's motion for summary judgment. (*Ibid.*)

19

The Court of Appeal held that the trial court erred and directed it to grant the insurer's motion for summary judgment. (*Fire Ins. Exchange*, *supra*, 181 Cal.App.4th at p. 390.) The Court of Appeal concluded the act of constructing the home was intentional and, therefore, not an accident under the policy, even though the insureds acted under a mistaken belief they had the right to do so. (*Id.* at p. 396.) No unexpected and unintended event occurred between the time of the intentional construction and the time of the encroachment on the neighbor's property. (*Ibid.*) Although the insureds believed they had the legal right to take the action they did, their "mistaken belief in their legal right to build does not transform their intentional act of construction into an accident." (*Ibid.*)

B. *Moorefield Performed a Deliberate Act and No Additional, Unexpected, Independent, and Unforeseen Happening Produced the Damage.*

It is not disputed that Moorefield acted deliberately in directing Solo Flooring to install the VCT's and carpet tiles on the concrete slab at the Best Buy Building. The evidence at trial established that Moorefield knew at the time that two separate tests had shown the moisture vapor emission rate from the concrete slab exceeded specifications. Cote discussed the moisture vapor emission rate results with representatives of DBO and Best Buy and the decision was made, based on a cost-benefit analysis, to install the flooring.

Because Moorefield, the insured, performed a deliberate act, there was no accident unless "some additional, unexpected, independent, and unforeseen happening occurs that produces the damage." (*Fire Ins. Exchange*, *supra*, 181 Cal.App.4th at p. 392.) Such was not the case. After installation of the flooring, nothing else happened that might have caused the flooring to fail. The trial court found that the VCT's and carpet tiles failed due to excessive concrete slab moisture from the original construction. The court based this finding on the testimony of Dr. Luft, whose testimony the court

20

found to be "convincing and worthy of great weight." The court rejected other potential causes, including roof leaks.

Moorefield argues the trial court erred by not giving greater consideration to the testimony of its expert, Geoffrey Hichborn, who opined that roof leaks might have caused the flooring to fail. As the trier of fact, the court was the ultimate judge of the weight and credibility of witness testimony. (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1029; *As You Sow v. Conbraco Industries* (2005) 135 Cal.App.4th 431, 454.) The trial court found Hichborn's testimony to be "mere speculation" and relied instead on Luft's testimony, as the court was entitled to do.

Excess moisture in the concrete slab, creating high levels of moisture vapor emission, was not an additional, unexpected, independent, or unforeseen event. Moorefield knew of the moisture vapor emission test results and knew those results exceeded specifications. Excess moisture was not independent of Moorefield's intentional act but was the topic of discussion before the decision was made to install the flooring. Solo Flooring anticipated problems due to high moisture and would not install the flooring unless Moorefield released it from warranty claims.

The trial court found that "[Moorefield] elected to proceed with installation knowing that the moisture content exceeded design specifications and knowing that the installer required a waiver to do the installation." The court also found that Moorefield took a risk when it decided to have the flooring installed immediately so the Best Buy store could open in October rather than wait for the concrete slab to eliminate more of its moisture content. Substantial evidence supported those findings. Cote testified the decision to install the flooring was based on a cost-benefit analysis—get the Best Buy Store open for holiday shopping and deal with any flooring problems later—rather than on a belief that moisture emission could not cause the flooring to fail.

Michael Moorefield believed it was safe to install the VCT's and carpet tiles despite the high moisture vapor emission rate, and Cote testified he believed there

21

was little to no risk of the floor failing. If Michael Moorefield and Cote sincerely believed there was little or no risk to installing the VCT's and carpet tiles, despite the results of the two moisture vapor emission rate tests, they were mistaken. An insured's mistake of fact or law does not transform an intentional act into an accident. (*Fire Ins. Exchange*, *supra*, 181 Cal.App.4th at p. 393.) Moreover, the trial court could have disbelieved Michael Moorefield and Cote, or discounted their testimony. Evidence that important documents, including the results of the two moisture vapor emission rate tests, were missing from the Moorefield job file seriously damaged Michael Moorefield's and Cote's credibility.

Moorefield argues that in every case in which a court has found "no occurrence," either the insured's act "led directly and immediately to the injury" or "the act and the injury occurred simultaneously." According to Moorefield, its act of directing Solo Flooring to install the VCT's and carpet tiles was an occurrence under the Policies because the flooring damage was caused by moisture vapor emission from the concrete slab over a period of years. This argument fails both factually and legally. Factually, Moorefield's decision to have the flooring installed did lead almost immediately to damage. Evidence at trial showed that problems with the carpet tiles at the Best Buy Building arose within a few months of flooring installation, as early as the Best Buy store grand opening.

Legally, nothing in case law places a restriction on the time between the insured's act and the damage for which the insured is being held liable. Moorefield engaged in an intentional act that produced property damage. The length of time between the insured's act and the damage (or its manifestation) might bear upon whether the damage was produced by an additional, unexpected, independent, and unforeseen happening. But as we have explained, excess moisture vapor emission from the concrete slab was none of those things.

22

## C.  *Arguments of Amicus Curiae*

Amicus curiae Building Industry Legal Defense Foundation (BILD) argues a construction defect always should be deemed an "occurrence" within the meaning of CGL policies, even when the contractor intentionally performs the work with the "knowledge that work may create a risk of further events that could lead to harm." For in that situation, BILD argues, "the harm is nevertheless fortuitous and unintended, and the result of an 'accident.'" BILD relies heavily on French, *Construction Defects: Are They "Occurrences"?* (2011/2012) 47 Gonz. L.Rev. 1, 48, which posits that "[c]onstruction defects are 'occurrences' under standard form CGL policies." After surveying case law from across the nation, that article concludes: "Thus, unless the insurer can prove that the policyholder/contractor expected or intended its workmanship to be defective and cause property damage, the faulty workmanship was accidental and thus, an 'occurrence.'" (*Ibid.*)

We emphasize that we need not and do not decide whether all construction defects are "occurrences" under a standard CGL policy. We only decide whether, based on the record before us, Moorefield's conduct for which liability was sought to be imposed constituted an accident under California law. We conclude Moorefield's conduct was not an accident because it was a deliberate decision made with knowledge that the moisture vapor emission rate from the concrete slab exceeded specifications. This was not a case in which a contractor engaged in conduct only later discovered or revealed to constitute a construction defect. Navigators proved that Moorefield knew about and intended to perform defective work with the hope or mistaken belief the defect would not cause property damage. Although there was no evidence that Moorefield intended to cause property damage, under California law, "[t]he insured's subjective intent is irrelevant." (*Fire Ins. Exchange*, *supra*, 181 Cal.App.4th at p. 392.)

We also do not address whether the moral hazard problem applies. The theory of the moral hazard problem is that "a policyholder/contractor effectively would

have little incentive to perform its work well if it were covered for the damages it caused to third parties." (French, *Construction Defects: Are They "Occurrences"?*, *supra*, 47 Gonz. L.Rev. at p. 42.) Our conclusion that there was no covered accident in this case is based only on the language of the Policies, the evidence presented at trial, the statement of decision, and California law. Thus, we have no reason to consider the moral hazard problem or other public policies disfavoring insurance recovery.


## II.

### The Supplementary Payments Provision Applies to Some Portion of the $1 Million Paid by Navigators Toward Settlement.

A. *Introduction*

The Policies have a standard supplementary payments provision stating that, "with respect to any claim . . . or any 'suit' against an insured we defend," Navigators will pay "[a]ll costs taxed against the insured." Navigators tendered policy limits of $1 million toward the settlement of the underlying litigation. Moorefield argues that, even if Navigators had no duty to indemnify under the Policies, Moorefield is not obligated to reimburse all of the $1 million paid by Navigators toward the settlement because the supplementary payments provision required Navigators to pay that portion of the settlement attributable to attorney fees and costs of suit.[2]

---

[2] Moorefield's argument regarding the amount of reimbursement is, in effect, an argument that damages were excessive. To preserve a claim of excessive or inadequate damages for appeal, a party must move for a new trial. (*Schroeder v. Auto Driveaway Co.* (1974) 11 Cal.3d 908, 918; *Silas v. Arden* (2012) 213 Cal.App.4th 75, 92.) Moorefield moved for a new trial and in that motion argued Navigators was not entitled to reimbursement of that portion of the settlement amount attributable to attorney fees and costs of suit. The issue regarding the amount of reimbursement was therefore preserved for appeal.

Three points are significant to the standard supplementary payments provision of the Policies. First, costs of suit include attorney fees when they are, or would be, taxable as costs of suit. (*Employers Mutual Casualty Co. v. Philadelphia Indemnity Ins. Co.* (2008) 169 Cal.App.4th 340, 349; *Insurance Co. of North America v. National American Ins. Co.* (1995) 37 Cal.App.4th 195, 206-207.) Second, supplementary payments are tied to the insurer's obligation to defend and, therefore, the insurer's obligation to pay costs of suit arises only if the insurer has a contractual duty to defend. (*State Farm General Ins. Co. v. Mintarsih* (2009) 175 Cal.App.4th 274, 285-286 (*Mintarsih*).) Third, an insured is entitled to recover costs of suit under the supplementary payments provision when the lawsuit settles if, and to the extent, the settlement includes costs of suit. (*Employers Mutual Casualty Co. v. Philadelphia Indemnity Ins. Co.*, *supra*, at pp. 348-349; *Prichard v. Liberty Mutual Ins. Co.* (2000) 84 Cal.App.4th 890, 912.)[3] We address each of these points in succession in the Discussion section, parts II.B, II.C, and II.D.

B. *Contract-based Attorney Fees Are Costs of Suit Under the Supplementary Payments Provision.*

JSL filed a complaint, a first amended complaint, and a second amended complaint against DBO and Moorefield. JSL's initial complaint, filed in January 2010, asserted causes of action against Moorefield for breach of the Construction Contract, negligence, and declaratory relief. JSL's first amended complaint, filed two weeks later, added a cause of action against Moorefield for breach of implied warranty. Both JSL's initial complaint and first amended complaint alleged the foundation of the Best Buy Building had been defectively installed in that curing compound had been sporadically applied.

---

[3] In 2007, the standard CGL form policy was changed to include a provision excluding from supplementary payments "'attorneys' fees or attorneys' expenses taxed against the insured.'" (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2016) ¶¶ 7:160.3a-7:160.3b, p. 7A-77.)

25

Over two years later, in April 2012, JSL filed its second amended complaint, which included causes of action against Moorefield for breach of the Construction Contract, breach of implied warranty, and declaratory relief. JSL alleged that Moorefield breached the Construction Contract "by negligently installing the defective Foundation." In the second amended complaint, JSL alleged, for the first time, that the foundation of the Best Buy Building was defective in that Moorefield installed flooring on top of the concrete slab despite knowing about excessive moisture levels.

JSL's right to recover attorney fees would have been based on the Construction Contract. Section 14.7 of the Construction Contract provides: "If any action at law, in equity, or in arbitration is brought to enforce or interpret the provisions of this Contract or arising out of or relating to this Contract, the prevailing party will be entitled to all expenses, costs, and reasonable attorneys' fees incurred in such action." In its cross-complaint and first amended cross-complaint, DBO sought "attorney's fees and costs pursuant to contract."

Attorney fees, when authorized by contract, are allowable as costs of suit. (Code Civ. Proc., § 1033.5, subd. (a)(10).) Thus, attorney fees incurred by JSL and DBO would have been an item of costs falling within the supplementary payments provision of the Policies. (*Employers Mutual Casualty Co. v. Philadelphia Indemnity Ins. Co.*, *supra*, 169 Cal.App.4th at p. 349; *Insurance Co. of North America v. National American Ins. Co.*, *supra*, 37 Cal.App.4th at pp. 206-207.)

Relying on *Golden Eagle Ins. Co. v. Insurance Co. of the West* (2002) 99 Cal.App.4th 837 (*Golden Eagle*), Navigators argues that in construction litigation, attorney fees are an "extension of *damage* liability." *Golden Eagle* does not support that argument. In *Golden Eagle*, homeowners brought lawsuits against a contractor for construction defects. (*Id.* at p. 843.) The contractor sought indemnity from a subcontractor pursuant to an indemnity provision in the subcontracts. (*Id.* at pp. 842-843.) Some of the lawsuits settled before trial, while in others the homeowners

26

obtained judgment in their favor. (*Id.* at p. 843.) The subcontractor had tendered the claim to its insurer under a provision of the standard CGL policy providing coverage for liability assumed by the insured under a written contract by which the insured expressly assumed liability for damages covered by the policy. (*Id.* at p. 846.) Such a "covered contract" included the subcontracts with the indemnity provisions. (*Ibid.*)

The subcontractor's insurers paid the contractor $305,000 to settle its indemnity cross-complaint against the subcontractor as "'damages paid'" to the homeowners. (*Golden Eagle*, *supra*, 99 Cal.App.4th at p. 843.) Later, an arbitrator awarded the contractor over $605,000 for its attorney fees and costs of suit incurred in the homeowners' lawsuits. (*Ibid.*) One of the insurers, Golden Eagle Insurance Company (GEIC), sued another of the insurers, Insurance Company of the West (ICW), for reimbursement of the amount GEIC had paid toward the arbitration award. (*Id.* at pp. 843-844.) GEIC contended the contractor was an additional insured on the policies issued by ICW and, therefore, ICW was solely responsible for the contractor's defense costs. (*Id.* at p. 844.) ICW cross-complained against another insurance company, Connecticut Indemnity Company, and alleged that insurance company, as the subcontractor's insurer, was required to pay a portion of the arbitration award. (*Ibid.*)

The trial court, in ruling on cross-motions for summary judgment, found that the contractor's defense costs were not damages within the meaning of the CGL policies and, therefore, the subcontractor's liability for those costs under the indemnity provision was not covered. (*Golden Eagle*, *supra*, 99 Cal.App.4th at p. 844.) As a consequence, the trial court ruled, ICW breached its obligation to defend the contractor as an additional insured. (*Ibid.*)

The Court of Appeal addressed the issue, among others, whether the defense costs of the contractor (the indemnitee) were damages under the insured contract provision of the CGL policies issued to the subcontractor (the indemnitor). (*Golden Eagle*, *supra*, 99 Cal.App.4th at p. 845.) The Court of Appeal concluded, first, that the

27

subcontracts with the subcontractor, by which the subcontractor assumed the tort liability of the contractor, were "insured contracts" within the meaning of the CGL policies. (*Id.* at pp. 846-847.) The Court of Appeal concluded, next, that the indemnitee's attorney fees and costs incurred as a result of that tort liability constituted sums the indemnitor/insured became "'legally obligated to pay *as damages* because of' covered tort claims." (*Id.* at p. 851.) The court explained that "'[m]ost construction agreements or contracts require downstream contractors or subcontractors to protect upstream contractors' by way of indemnity provisions" and "many indemnification clauses in the construction industry 'include language that can be read to require a defense as well as indemnity.'" (*Id.* at pp. 851-852.)

*Golden Eagle* dealt with a situation in which the contractor/indemnitee sought indemnity from the subcontractor/indemnitor for the damages the contractor incurred as a result of a third party lawsuit. If an indemnitor fails to defend an indemnitee against a third party, the indemnitee may recover, as damages, its attorney fees and costs incurred in defending the third party claim. (Code Civ. Proc., § 1021.6 [implied indemnity]; *Searles Valley Minerals Operations Inc. v. Ralph M. Parsons Service Co.* (2011) 191 Cal.App.4th 1394, 1399 [contractual indemnity].) In that situation, the damages incurred by the indemnitee include the attorney fees and costs it incurred defending the third party lawsuit. That is because, as the *Golden Eagle* court noted, "it is established that the indemnitee's attorney fees constitute an 'item of damages' for the indemnitor's breach of its indemnity obligation." (*Golden Eagle*, *supra*, 99 Cal.App.4th at p. 852.)

In this case, however, Moorefield did not seek indemnification from its concrete and flooring subcontractors (Kiggins Construction and Solo Flooring) for damages Moorefield had to pay to JSL. Moorefield was sued by JSL for breach of the Construction Contract, negligence, and breach of implied warranty to recover damages JSL incurred for construction defects. JSL sought attorney fees from Moorefield based

28

on the attorney fees provision in the Construction Contract, the rights under which had been assigned to JSL. Moorefield's liability to JSL for attorney fees therefore would be as a cost of suit, not as damages.

### C. *Navigators Had a Duty to Defend Moorefield and Therefore Had an Obligation to Pay Attorney Fees and Costs of Suit Under the Supplementary Payments Provision.*

The trial court found that Navigators had no obligation to pay costs included within the settlement with JSL because "Moorefield's potential liability arose from a non-covered claim." We disagree.

The phrase "'any "suit" against an insured we defend'" (*Golden Eagle Ins. Corp. v. Cen-Fed, Ltd.* (2007) 148 Cal.App.4th 976, 992) in the supplementary payments provision of a standard CGL policy has been interpreted to mean the obligation to pay costs arises only if the insurer had a duty to defend the insured (*id.* at p. 996). The insurer has no obligation under a supplementary payments provision if no defense obligation ever existed. (*Id.* at p. 996.) The supplementary payments provision applies "*only* to those cases where the insurer actually owed a duty to defend." (*Ibid.*)

The duty to defend is broader than the duty to indemnify. (*Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1081 (*Horace Mann*).) "It is by now a familiar principle that a liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity. [Citation.]" (*Ibid.*) "[T]he test is whether the *underlying action for which defense and indemnity is sought* potentially seeks relief within the coverage of the policy." (*La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co.* (1994) 9 Cal.4th 27, 44.) "In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot.*" (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 300.)

"Once the defense duty attaches, the insurer is obligated to defend against all of the claims involved in the action, both covered and noncovered, until the insurer

29

produces undeniable evidence supporting an allocation of a specific portion of the defense costs to a noncovered claim. [Citations.] . . . Any doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor. [Citation.]" (*Horace Mann*, *supra*, 4 Cal.4th at p. 1081.)

Navigators accepted Moorefield's tender of defense. In June 2011, Navigators made that acceptance subject to a reservation of rights. "[T]he insurer may unilaterally condition its proffer of a defense upon its reservation of a right later to seek reimbursement of costs advanced to defend claims that are not, and never were, potentially covered by the relevant policy." (*Scottsdale Ins. Co. v. MV Transportation* (2005) 36 Cal.4th 643, 656 (*Scottsdale*).)

Navigators filed this lawsuit against Moorefield for declaratory relief to obtain an adjudication of the duty of Navigators to defend and indemnify. Navigators moved for summary adjudication of its duty to defend. Navigators argued there was no potential for coverage as a matter of law due to Moorefield's decision to have the flooring installed on a concrete slab with excessive moisture was not an accident.

In July 2013, the trial court denied the motion for summary adjudication on alternate grounds. The court denied the motion on the procedural ground that the motion did not attempt to resolve an entire cause of action but was limited to the duty to defend. The court also denied the motion on an alternate, factual ground. The court found there was a triable issue of fact on the duty to defend because "[t]he opposition to the motion shows that, not only does the affected carpet make up only a tiny fraction of the entire floor, but that there were other possible causes for the problems reported by the landlord."

When disputed factual issues preclude summary judgment in the insurer's favor, denial of a motion for summary judgment establishes the insurer's duty to defend absent additional evidence on the issue. (*Horace Mann*, *supra*, 4 Cal.4th at p. 1085; see Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 7:675, p. 7B-70.)

30

Denial of Navigators's motion for summary adjudication established that Navigators had a duty to defend Moorefield under the Policies and, accordingly, that Navigators had an obligation under the supplementary payments provision to pay costs of suit, including attorney fees. "The insurer must absorb all costs it expended on behalf of its insured while the duty to defend was in effect—i.e., before the insurer established that the duty had *ended*." (*Scottsdale*, *supra*, 36 Cal.4th at p. 657.)

Later, by means of the statement of decision and judgment, the trial court determined there was no coverage under the Policies and that Navigators did not have a duty to defend. A duty to defend can be extinguished only prospectively and not retrospectively. (*Scottsdale*, *supra*, 36 Cal.4th at p. 655.) However, "an insurer, having reserved its right to do so, may obtain reimbursement of defense costs which, in hindsight, it never owed"; that is, when the third party lawsuit "never presented any potential for policy coverage." (*Id.* at p. 657.) That situation arises when subsequent case law establishes, in hindsight, that no duty to defend ever existed. (*Id.* at pp. 657-658.) "By law applied in hindsight, courts can determine that no potential for coverage, and thus no duty to defend, ever existed. If that conclusion is reached, the insurer, having reserved its right, may recover from its insured the costs it expended to provide a defense which, under its contract of insurance, it was never obliged to furnish." (*Id.* at p. 658.)

Here, no case law arose subsequent to Navigators's acceptance of Moorefield's tender of defense which, if applied in hindsight, would have established that no duty to defend ever existed. The trial court determined that Navigators had no duty to indemnify because the evidence at trial showed the loss was caused by a noncovered occurrence—Moorefield's decision to have the flooring installed over a concrete slab having a moisture vapor emission rate exceeding specifications. The ultimate determination that the loss was caused by a noncovered occurrence does not mean that JSL's lawsuit (and DBO's cross-complaint) never presented any *potential* for policy

31

coverage. If that were so, a determination an insurer has no duty to indemnify would automatically extinguish the duty to defend retrospectively and give the insurer the right to seek reimbursement from the insured. That result is inconsistent with the firmly established principle that the duty to defend is broader than the duty to indemnify. (*Horace Mann*, *supra*, 4 Cal.4th at p. 1081.)

The claim that Moorefield was responsible for the flooring failure was potentially covered. At trial, Navigators failed to prove there was never any potential coverage under the Policies. JSL, in its initial and first amended complaints, alleged the foundation of the Best Buy Building had been defectively installed in that curing compound had been sporadically applied. Navigators does not contend the potential for coverage did not arise under the allegations of JSL's initial complaint and first amended complaint. Only in its second amended complaint—filed 27 months after the initial complaint—did JSL allege that Moorefield had flooring installed over concrete with excessive moisture. In addition, evidence developed during discovery uncovered other potential causes, such as roof leaks, for the flooring failure. Although the leading candidate was and remained moisture in the slab, as of March 2012, Decker believed there was a 20 percent chance of prevailing on the theory of roof leaks or a design defect.

The trial court cited, and Navigators relies on, *Mintarsih*, *supra*, 175 Cal.App.4th 274, for the proposition a supplementary payments provision does not give rise to an obligation to pay costs awarded against the insured that can be attributed only to claims that were potentially not covered. In *Mintarsih*, the insureds were sued, and later held liable, for various tort causes of action and Labor Code wage and hour claims. (*Id.* at p. 280.) The trial court ordered the insureds to pay attorney fees as costs pursuant to Labor Code section 218.5. (*Mintarsih*, *supra*, at p. 280.) The insureds had tendered their defense to their insurer, which had accepted subject to a reservation of rights. (*Ibid.*) The insurer brought a declaratory relief action for a determination of the parties' rights and duties under the insurance policies issued to the insureds. (*Id.* at pp. 280-281.)

32

The insureds conceded the insurer had no duty to indemnify them for amounts awarded for the wage and hour violations. (*Id.* at p. 281.) The trial court in the declaratory relief action held the insurer had a duty to indemnify the insureds for damages awarded on the tort causes of action and for costs, but had no duty to indemnify the insureds for attorney fees. (*Ibid.*)

The Court of Appeal concluded that the insurer's obligation under the supplementary payments provision of the policies extended only to costs of suit arising from claims that were potentially covered. (*Mintarsih, supra,* 175 Cal.App.4th at p. 279.) The right to recover attorney fees arose only under the statutory wage and hour claims, which were not potentially covered under the policy. (*Ibid.*) Because the right to recover attorney fees arose solely under the Labor Code, and there was never even a potential for coverage of the wage and hour claims, the insurer was not liable to pay attorney fees under the supplementary payments provision, notwithstanding the fact the insurer had a duty to defend the entire lawsuit. (*Id.* at pp. 286-287.)

In this case, JSL's right to recover attorney fees, and Moorefield's obligation to pay them, arose under the cause of action for breach of the Construction Contract. Navigators does not contend the Policies could never cover claims for breach of contract based on defective construction. While the wage and hour claims in *Mintarsih* could not even potentially have been covered, the claims forming the basis of JSL's breach of contract cause of action were potentially covered.

D. *The Trial Court Prejudicially Erred by Finding That Moorefield Did Not Meet Its Burden of Proving What Portion of the Settlement Was for Attorney Fees and Costs of Suit*.

Because the supplementary payments provision in the Policies covered attorney fees and costs paid as part of the settlement, and Navigators had a duty to defend a claim for which JSL and DBO could recover attorney fees, the final issue is whether,

33

and to what extent, the amount paid in settlement included attorney fees and costs of suit subject to the supplementary payments provision.

An insurer has an obligation to pay costs under a supplementary payments provision when a lawsuit settles, even though a court in that situation has not formally "taxed" costs. (*Employers Mutual Casualty Co. v. Philadelphia Indemnity Ins. Co.*, *supra*, 169 Cal.App.4th at pp. 348-349.) This means that, when litigation settles, and there was a duty to defend, the insured may recover from the insurer the amount paid toward the settlement that represented costs under the supplementary payments provision.

Because Navigators had a duty to defend, it was not entitled to reimbursement from Moorefield of attorney fees and costs of suit paid under the supplementary payments provision. The trial court ruled that Navigators was entitled to reimbursement of the full $1 million it paid toward the settlement. The trial court did not make an express finding that, of the amount paid in settlement, all was for damages or none was for attorney fees and costs. Instead, the trial court found that "[Moorefield] has not proven by a preponderance of the evidence what portion, if any, of Navigators' settlement payment was attributable to costs."

No objections were made to the statement of decision, and no party brought omissions or ambiguities in it to the trial court's attention, so we will infer the trial court made findings favorable to the prevailing party—Navigators—on all issues necessary to support the judgment. (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 59-60.) We therefore infer the trial court made an implied finding that none of the $1 million paid by Navigators toward the settlement was attributable to contract-based attorney fees and costs (or, put another way, that all of the $1 million paid by Navigators was for damages). We review implied findings for substantial evidence. (*Id.* at p. 60.)

The trial court's allocation of the burden of proof to Moorefield was, however, a legal error, not a factual one. The insurer, not the insured, has the burden of proving by a preponderance of the evidence that "the settlement payments were allocable

34

to claims not actually covered, and the defense costs were allocable to claims not even potentially covered." (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 15:305, p. 15-57.) In *Buss v. Superior Court* (1997) 16 Cal.4th 35, 53, the California Supreme Court concluded the insurer bears the burden of proving reimbursement of defense costs from the insured.

Misallocation of the burden of proof in a bench trial is not reversible error per se but must be prejudicial to warrant reversal. (*Perez v. VAS S.p.A.* (2010) 188 Cal.App.4th 658, 679.) Prejudice means "'a reasonable probability that in the absence of the error, a result more favorable to [the appellant] would have been reached.'" (*Diaz v. Carcamo* (2011) 51 Cal.4th 1148, 1161.) A probability does not mean "more likely than not" but "a *reasonable chance*, more than an *abstract possibility*." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.)

Whether the trial court's misallocation of the burden of proof was prejudicial depends on the sufficiency of the evidence to support the implied finding that none of the $1 million paid by Navigators toward the settlement was allocable to contract-based attorney fees and costs. (See *In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, 736 ["misallocation of the burden of proof is not 'reversible error *per se*'" and "does not vitiate the substantial evidence rule"]; *Merrill v. Normandie Corp.* (1930) 110 Cal.App. 621, 623 ["the question of the weight of evidence and the question of upon whom rests the burden of proof become purely academic when the trial court has found upon substantial evidence that the essential facts have been proved"].) If substantial evidence supported the implied finding, then the trial court's misallocation of the burden of proof would be harmless because there would be no reasonable probability the court's decision would have been different in absence of the error. In *Perez v. VAS S.p.A.*, *supra*, 188 Cal.App.4th at page 679, the Court of Appeal concluded that the trial court's failure to use the correct burden-shifting analysis was harmless because

35

substantial evidence supported an express finding on which the trial court based its decision.[4]

Here, substantial evidence did not support an implied finding that all of the $1 million paid toward the settlement by Navigators was attributable to damages and none was attributable to contract-based attorney fees and costs of suit. At trial, overwhelming and unquestionably credible evidence was presented that, of the $1,310,000 paid in settlement to JSL and DBO, at most $377,404 was for cost of repair damages. That figure was the amount Best Buy withheld from rental payments as costs to repair the flooring.

In February 2012, Decker prepared a report to Navigators, which was admitted in evidence as exhibit No. 59, in which Decker stated: "JSL seeks to recoup repair/investigation costs in the amount of $377,404. These costs have been verified through the discovery process, principally by reviewing the documentary record and deposing the persons most knowledgeable on the subject from JSL and Best Buy." Decker believed that amount was too high and defense experts would present reasonable repair costs "in the range of $100,000-$150,000." Also in the February 2012 report, Decker reported that JSL was seeking to recover attorney fees pursuant to the Construction Contract and that "JSL's claimed legal fees are $330,578 and are expected to continue to rise as this case approaches trial."

---

[4] The rule appears to be different when the trial court correctly allocates the burden of proof, but finds there was a failure to meet that burden. "'[W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."'" (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466.)

A Navigators's internal pretrial report from March 2012 stated: "JSL's damages consist of two claims. First, JSL seeks to recoup the lost rent withheld by Best Buy for repair costs on the floor. *This claim has been firmly set at $377,404*. Additionally, JSL seeks to recover its legal fees in the amount of $330,578 pursuant to the provision of the Construction Agreement between Moorefield and DBO, which JSL claims has been assigned to it. . . . Obviously, the claim for legal fees will continue to increase as trial nears and occurs." This internal report was admitted in evidence as exhibit No. 137.

In a memorandum from November 2012, received in evidence as exhibit No. 63, Decker concluded that JSL and DBO would be entitled to recover attorney fees and costs of suit pursuant to section 14.7 of the Construction Contract. JSL submitted a mandatory settlement conference statement in January 2013. In that statement, admitted in evidence as exhibit No. 140, JSL's demand was for $1,305,456 of which $377,404 was for "Best Buy 'self-help' repairs" and $474,923 was for "[l]egal fees and costs (as of 12/31/2012)."

At trial, Decker testified it was his understanding that JSL planned to make a claim for cost of repairs that was "fixed" in the amount of about $370,000. He testified that JSL and DBO would be making a claim for attorney fees which could have been in the range of $600,000 to $700,000. Later, Decker testified that "[JSL] had a claim for damages that [it] suffered as a result of the allegedly defective floor or slab. Those damages were measured in terms of the lost rent that had been withheld, as well as the cost of investigating the problem and repairing the problem." Decker testified he understood that JSL would have sought recovery of attorney fees pursuant to the attorney fees provision in the Construction Contract.

In light of this evidence, Navigators's contention that Moorefield "presented no evidence at trial that supports its costs versus damages allocation of the settlement" is patently wrong. To the contrary, the evidence established conclusively that

at least some part of the $1 million paid toward the settlement by Navigators was for attorney fees and costs of suit falling within the supplementary payments provision. The settlement amount was $1,310,000 of which JSL received $885,000 and DBO received $425,000. Out of the $1,310,000 paid in settlement, a maximum of $377,404 represented the cost of repair damages to JSL. If the entire $425,000 received by DBO was for damages for indemnity from Moorefield, then the amount paid in damages would total $802,404 ($377,404 + $425,000) which is $197,596 less than the $1 million contributed by Navigators. That calculation is extremely generous to Navigators because $160,000 of the settlement was made up of contributions from Best Buy, Kiggins Construction, George Roofing, and Solo Flooring.

Navigators relies on the provision in the settlement agreement providing that the parties "shall bear their own respective costs and attorneys' fees incurred as a result [of] the claims, the action, the DBO coverage action and in preparing and executing this agreement." (Some capitalization omitted.) Navigators argues this cost waiver provision conclusively establishes that the entire amount paid in settlement was for damages, for which Navigators had a right to be reimbursed.

We disagree. An appellate court independently construes a contract when no extrinsic evidence is introduced or when the extrinsic evidence is not in conflict. (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955.) As Moorefield explains, such attorney fee and cost waivers are included in settlement agreements to prevent a party from seeking prevailing party attorney fees from the court. Based on the language of the settlement agreement, we interpret the purpose of the cost waiver provision in the settlement agreement in the same way. Indeed, without such waiver, the plaintiff obtaining a monetary recovery in a settlement agreement would be the prevailing party under Code of Civil Procedure section 1032, subdivision (a)(4) and therefore, under section 1032, subdivision (b), would be able to recover costs, which might include attorney fees under

38

Code of Civil Procedure section 1033.5, subdivision (a)(10). (*DeSaulles v. Community Hospital of Monterey Peninsula* (2016) 62 Cal.4th 1140, 1144.)

The interpretation urged by Navigators is contrary to the undisputed evidence that the cost of repair damages was $377,404 and that at least some part of the settlement was for attorney fees, which JSL and DBO had sought under the attorney fees provision of the Construction Contract. How the settlement agreement characterized the amount paid in settlement (damages or costs of suit) is not proof supporting a finding that Navigators is entitled to recoup the entire $1 million. Navigators had the right to be reimbursed only that amount paid as damages for property damage to which the Policies applied, i.e., caused by a covered occurrence. The settlement agreement, to which Navigators was not a party, cannot alter the meaning of the Policies. In sum, the settlement agreement neither satisfied Navigators's burden of proof nor constituted substantial evidence supporting an implied finding that none of the $1 million paid by Navigators was for attorney fees and costs of suit.

Navigators also argues that in construction litigation, the indemnitee's attorney fees are characterized and recoverable as damages. As we have explained, JSL did not sue Moorefield for indemnity. JSL sued Moorefield under the theory that by negligently installing the foundation and/or negligently having the flooring installed on concrete emitting excessive moisture vapor, Moorefield breached the Construction Contract and was liable for negligence and breach of implied warranty. Navigators identifies no evidence to show that JSL sought to obtain indemnity from Moorefield of attorney fees JSL spent to litigate against Best Buy. DBO did sue Moorefield for indemnity, but, as we have explained, even if the entire $425,000 in settlement proceeds paid to DBO represented indemnification from Moorefield (highly unlikely because DBO also sought indemnity from Solo Flooring, Kiggins Construction, and George Roofing) about $198,000 of the $1 million paid by Navigators would be attorney fees and costs of suit.

39

Substantial evidence did not support the trial court's implied finding that none of the $1 million contributed by Navigators to the settlement was for attorney fees and costs of suit subject to the supplementary payments provision of the Policies. The trial court's error in misallocating the burden of proof to Moorefield, therefore, was prejudicial. The matter will be remanded for a new trial limited to the issue of the amount, proven by Navigators, which Moorefield must reimburse from the $1 million paid by Navigators toward settlement of the underlying litigation. As explained in this opinion, that amount is limited to damages. Moorefield may keep the amount attributable to attorney fees and costs of suit under the supplementary payments provision.

## III.

### Conclusion

Navigators had no duty under the Policies to indemnify Moorefield because the flooring failure was not a covered occurrence. Navigators did have a duty to defend and therefore had an obligation to make payments under the supplementary payments provision of the Policies. While Moorefield must reimburse Navigators for that portion of the $1 million paid by Navigators toward the settlement that is attributable to damages, Moorefield may keep whatever portion is attributable to attorney fees and costs of suit under the supplementary payments provision.

The trial court prejudicially erred by allocating to Moorefield the burden of proving the portion of the $1 million paid by Navigators is attributable to attorney fees and costs of suit covered by the supplementary payments provision. The matter is remanded for a new trial solely on the issue of what portion of the $1 million paid by Navigators is attributable to attorney fees and costs of suit covered by the supplementary payments provision.

40

## DISPOSITION

The judgment is affirmed insofar as it declares that Navigators had no duty to indemnify Moorefield under the Policies. In all other respects, the judgment is reversed and the matter is remanded for a new trial limited to the issue identified in this opinion. In the interest of justice, no party shall recover costs on appeal.


FYBEL, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.