Filed 4/25/23 P. v. Espinoza CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CHRISTINE ELIZABETH ESPINOZA,<br><br>Defendant and Appellant. | C095758<br><br>(Super. Ct. Nos. 14F01201, 14F01270, 15F02768, 16FE005418) |

Defendant Christine Elizabeth Espinoza appeals from the trial court's order extending her commitment to the Department of State Hospitals (Pen. Code, § 1026.5, subd. (b))[1] and denying her petition for outpatient release to the community under the supervision of the conditional release program (CONREP) (§ 1026.2).  She claims insufficient evidence supports the court's extension order, and the court prejudicially

---

[1] Further undesignated statutory references are to the Penal Code.

1

erred by shifting her burden of proof regarding her petition for outpatient release to the People.

We first conclude substantial evidence supports the trial court's extension order, and therefore we will affirm that order. Next, while we agree with Espinoza that the court erred by shifting Espinoza's burden of proof to the People, we conclude the error was harmless. Accordingly, we will also affirm the court's order denying Espinoza's petition for release into the community under the supervision of CONREP.

## FACTS AND PROCEEDINGS

*Factual Background*

Espinoza has been diagnosed with schizoaffective disorder (bipolar type), and methamphetamine and opioid use disorders. Espinoza used various substances in her teenage years and her twenties but had not experienced symptoms related to mental illness. Around 2013, when she was about 30 years old, her methamphetamine use increased, which coincided with a significant decompensation. She experienced mania, hallucinations, and delusional beliefs, including that people were trying to "pop her soul," certain people were demons or Satan, and Satan was working for Jesus. She experienced symptoms while under the influence of methamphetamine as well as while sober, indicating that her psychosis was independent of her substance use, although substance use could exacerbate the symptoms of her mental illness.

Beginning in 2014, Espinoza repeatedly followed and harassed a sheriff's deputy (the deputy) while in custody, including writing the deputy's name all over her jail cell and tattooing the deputy's name on herself.

In 2014 and 2015, Espinoza was charged and convicted of felony grand theft (§ 487, subd. (a)) related to shoplifting over $950 worth of wine and champagne bottles, felony embezzlement (§ 508) from her place of employment, and a combined conviction for felony assault with force likely to produce great bodily injury (§ 245, subd. (a)) related to ramming a shopping cart into an employee while shoplifting, and misdemeanor

2

theft (§ 484, subd. (a)) related to entering a gas station convenience store while pretending to have a gun, threatening to kill employees if they did not give her money, and stealing $200.[2] Espinoza acknowledged she committed crimes in order to go to jail to see the deputy. In 2016, while on probation for the aforementioned convictions, Espinoza sent the deputy 53 typed and handwritten pages in which she expressed various delusional beliefs and sexual and threatening content, including that Jesus said she had to kill the deputy, that she wanted to drink the deputy's blood, and that Jesus promised her that she could rape the deputy. Espinoza was arrested and charged with making criminal threats (§ 422) and stalking (§ 646.9, subd. (a)) related to those letters. She pled no contest to the stalking charge and agreed to be found not guilty by reason of insanity on probation violation allegations. Pursuant to that agreement, Espinoza was committed to the Department of State Hospitals for a maximum term of five years four months.

In June 2019, Espinoza was discharged from Napa State Hospital (NSH) and released to the community under the supervision of CONREP. In May 2020, Espinoza decompensated. She did not report her decompensation, despite having a plan to do so, because her symptoms and delusions felt so real she did not believe she was decompensating. She experienced delusions and auditory hallucinations, including believing that she was communicating telepathically with her therapist, whom she believed had authorized her to purchase alcohol. She prepared a box for the deputy, into which she placed a knife, writings expressing delusional beliefs regarding the deputy, and other items, and she prepared writings for her therapist expressing delusional beliefs. She also carried a knife on her person. She was arrested on May 2, 2020; she had consumed alcohol and a Rockstar energy drink that day. She was readmitted to NSH in October 2020.

---

[2] The assault charge was originally charged as a robbery. (§ 211.)

*Commitment Extension Proceedings*

On March 4, 2021, Espinoza filed a petition to transfer to outpatient treatment under the supervision of CONREP. (§ 1026.2.) The court appointed Dr. Elizabeth Stotler-Turner to evaluate Espinoza's current mental condition to determine whether she would be a danger to the health and safety of others if treated in the community.

In April 2021, Espinoza had made sufficient progress that she was recommended to be released to outpatient treatment. However, in August 2021, after receiving a "less-than-favorable" report from CONREP, Espinoza experienced a "very rapid" decompensation and was segregated from her roommates because she was experiencing symptoms of her mental illness and presented a risk of violence. She expressed signs of mania or hypomania in addition to psychosis, including delusional beliefs and violent ideation, such as making "cold threats" to staff.[3] She believed she was God, members of the treatment staff were Satan and were out to harm her, people were trying to "pop her soul," witchcraft had been performed on her and she did not have a mental illness, and Jesus or God was providing her with commands or directives of behaviors to engage in. She denied experiencing any depressive, anxiety-related, or manic symptoms and initially refused a change in her medication during this time, but later agreed.

NSH senior psychologist Dr. Rachel Powers interviewed Espinoza in August 2021 and subsequently recommended that she remain hospitalized due to the recency and severity of her symptoms, which matched the symptoms she experienced at the time of her committing offense. Espinoza asserted during the interview that she had recognized the early signs of decompensation and sought out the support of staff, but Dr. Powers noted the records demonstrated that she had failed to recognize her symptoms for several days.

---

[3] A "cold threat" alludes to violence; for example, "something bad might happen to you," or "I'm going to get you."

4

On November 24, 2021, the People filed a petition to extend Espinoza's commitment to the State Department of Mental Health for an additional two years. (§ 1026.5, subd. (b).)[4] In support of their petition, the People attached a November 2021 report prepared by Dr. Powers, which recommended that Espinoza's commitment be extended because she posed a substantial risk of physical harm to others and continued to have difficulty controlling her dangerous behavior.

The parties conducted a five-day bench trial on Espinoza's petition to transfer to outpatient status and the People's petition to extend her commitment. Among the witnesses at trial were Dr. Stotler-Turner, Dr. Powers, and Rhonda Love, who was familiar with Espinoza's conduct while on CONREP from 2019 to 2020.

Dr. Stotler-Turner was a clinical psychologist who worked for the Board of Parole Hearings and had a private forensic practice. To prepare her evaluation of Espinoza, she reviewed Espinoza's records and interviewed her in May 2021. She evaluated Espinoza's risk for violence using a structured risk assessment tool used in the forensic psychology field known as the Historical Clinical and Risk Management 20, Version 3 (HCR-20). The HCR-20 assists evaluators conceptualize risk factors from the individual's historic past, recent past (known as "clinical factors"), and future.

Dr. Stotler-Turner identified the factors relevant to Espinoza's risk of violence as her major mental illness, violence and violent attitudes, substance use, problematic relationships, and problems with treatment and supervision response. She opined that Espinoza's history of mental illness, which had contributed to her prior acts of aggression and psychotically driven violence, was "extremely relevant" due to her recent rapid and severe decompensation, which Espinoza failed to recognize or report. Additionally, while Espinoza recognized she was delusional, she did not appear to understand the

---

[4] The State Department of Mental Health is now known as the State Department of State Hospitals.

5

severity of her delusions or the severity of her behaviors. Instead, Espinoza had a pattern of minimizing her prior violent or aggressive behaviors, including stating that she was not really a violent person and describing her threats to the deputy as a joke or otherwise minimizing those threats. In assessing Espinoza's violence and violent attitudes, Dr. Stotler-Turner noted that Espinoza had possessed weapons while on CONREP and had a delusional understanding of her relationship with the deputy, which had caused her to threaten the deputy and commit a robbery to get back to the deputy.

Dr. Stotler-Turner also found Espinoza's history of substance use relevant because Espinoza had recently relapsed to alcohol while on CONREP, her plans for sobriety upon release to the community were underdeveloped or insufficient, she continued to lack an understanding of her internal triggers for substance use, and she had requested to be taken off medication while on CONREP just before decompensating.

Turning to Espinoza's risk management factors, Dr. Stotler-Turner recognized Espinoza had a support system, but she observed that Espinoza recently decompensated while that support system was in place, and there was no indication that her support system was better prepared to assist her should she be released. Nor had Espinoza improved her ability to cope with or tolerate stress. Stotler-Turner was also concerned that Espinoza would not fully engage in future substance use recovery programs based on her previous experience with such programming.

Dr. Stotler-Turner acknowledged Espinoza had not been physically violent since she was initially committed. She also recognized that Espinoza was aware she had schizoaffective disorder and was able to describe her various symptoms, was forthright about her past substance abuse and involvement with the criminal justice system, and admitted that the deputy was probably scared by her actions. Nevertheless, she opined that Espinoza continued to represent a danger to others due to her illness because she was not any better prepared for release than she was the last time she was on CONREP.

Dr. Powers also assessed Espinoza's risk of violence in the community using the HCR-20, and she opined that Espinoza represented a substantial danger of physical harm to others due to her mental illness, and that she had serious difficulty controlling her dangerous behavior. In assessing Espinoza's risk of violence, Dr. Powers identified as relevant factors her major mental disorder, her history of violence and substance use, her recent and historical problems with treatment and supervision response, her recent problems with instability, and her lack of insight.

Dr. Powers noted the severity and speed with which Espinoza's symptoms appeared in the hospital setting during her August 2021 decompensation. While Espinoza understood that she has been diagnosed with a mental illness and could identify her symptoms, she had been unable to identify her symptoms or respond to the feedback of her treatment team during her decompensation, and she had initially refused to make recommended medication changes. Dr. Powers also noted that Espinoza continued to blame others for the degree to which she declined, rather than taking responsibility, she frequently presented as anxious and urgent and relied on staff to reduce her anxiety, and she had acted in unusual or dangerous ways, including pacing, chanting, posting notes on her wall that said, "Fuck you," playing music at odd times, and reporting that God or Jesus informed her what she needed to do. Powers also pointed to Espinoza's ongoing fixation on changing her medications, which she considered relevant because medication changes had historically preceded her decompensations.

According to Dr. Powers, Espinoza continued to have gaps in her appreciation for the severity of her illness and her risk of violence, and she overestimated her ability to prevent the symptoms of her illness. For example, Espinoza failed to appreciate the imminent risk of violence she posed while on CONREP due to her alcohol and caffeine use, her delusions, and her purchase and possession of knives. While Espinoza stated she did not want to hurt anyone with knives, she continued to have gaps in her understanding

7

as to why she purchased and carried knives, and her behavior suggested someone was going to get hurt.

Dr. Powers acknowledged that Espinoza had not physically assaulted anyone from the time she was hospitalized in 2016 through the time of trial.[5] But the absence of recent physically violent conduct by Espinoza did not affect her opinion that Espinoza represented a danger of physical harm to others; she observed that NSH had structures in place to mitigate patients' risk of violence and to relieve the stress of everyday life. She noted that Espinoza would be at greater risk of violence in an outpatient program because those programs typically have less monitoring and staff than a hospital, making it more difficult to perform rapid interventions, and often require patients to administer their own medications. In Dr. Powers's opinion, the recency of Espinoza's symptoms and her current level of insight outweighed her lack of violent conduct in the hospital.

Turning to Espinoza's plans for release, Dr. Powers testified that Espinoza's support group had not been sufficient to prevent her decompensation while she was on CONREP. Because Espinoza lacked an appreciation for the severity and competency of her mental illness, she was unlikely to understand the ongoing self-reflection required to understand her illness.

Dr. Powers also recognized that Espinoza had not completed a substance use treatment program, and her relapse prevention plan did not have a section specifically outlining her plan for maintaining her sobriety if released. She noted that Espinoza consumed alcohol on the day she was arrested while on CONREP, and she has never exhibited sobriety outside of a supervised setting.

---

[5] Dr. Powers testified that the letters Espinoza sent to the deputy were a violent act as defined by the HCR-20, which defines violence to include psychological harm, but she acknowledged those letters were sent before 2016.

8

Dr. Powers opined that Espinoza represented a high risk of violence if released from the hospital due to the number of clinical factors present within the six months prior to her testimony, and her insufficient plans for release. She concluded Espinoza needed to be free of symptoms for a longer period before she could be deemed to be in remission, during which time she needed to gain additional insight into her illness and develop a plan to prevent violence when released to the community. She disagreed with the assertion that Espinoza's compliance with medication meant she was able to control her substantial danger of physical harm to others; she observed that Espinoza experienced breakthrough symptoms even when medication-compliant in the hospital.

Love was the senior clinical director for CONREP. She opined that Espinoza was not ready for release into the community due to her August 2021 decompensation, which mirrored her May 2020 decompensation while on CONREP. In both instances, she failed to appreciate the warning signs of her decompensations, was in denial that she was decompensating, and had appeared well before experiencing delusions, after which she became fixated on others and became aggressive. Love explained that it is crucial for those in an outpatient program to be able to identify warning signs and early symptoms of their mental illness because CONREP staff are not constantly with the individuals, and an inability to follow a release plan indicates that the individual is not ready to be released into CONREP. Love also expressed the concerns that Espinoza's wellness and recovery plan had not been changed to help her identify the warning signs of her illness, and that she would have access to drugs and alcohol if released. On cross-examination, Love acknowledged that Espinoza had not engaged in physical violence during her time on CONREP.

*Trial Court Ruling*

The trial court granted the People's petition to extend Espinoza's commitment and denied Espinoza's petition for outpatient treatment.

9

With respect to the People's petition to extend Espinoza's commitment, the trial court first found beyond a reasonable doubt that Espinoza represented a substantial danger of physical harm to others as a result of her mental disease. The court noted Espinoza's August 2021 decompensation "went on for a while" before she told hospital staff she was having trouble sleeping, and in May 2020 she experienced delusions for long enough to prepare the box for the deputy. Once decompensated, Espinoza quickly developed violent ideation, exhibited by her possession of knives and her belief that Jesus told her to kill the deputy. While Espinoza had not engaged in actual violence as a direct result of her delusions, she had a history of committing violent acts while delusional, including committing a robbery, ramming into a store employee with a shopping cart while shoplifting, threatening a store clerk, and hitting a car with a hammer. The court found that Espinoza's mental illness lessened her inhibitions, creating a substantial danger of physical harm to others.

The trial court then found beyond a reasonable doubt that Espinoza had serious difficulty controlling her dangerous behavior. It recognized that Espinoza "appreciates what is happening to her," but her May 2020 and August 2021 decompensations demonstrated that she had not yet learned to control the "underlying mythology or spirituality" that caused her, when decompensated, to believe she was being directed or controlled by Jesus and by demons, and that they were attempting to capture her soul. The court ordered her commitment extended for two years.

Next, the trial court found by a preponderance of the evidence that, due to a mental disease, Espinoza would be a danger to others if treated in the community under supervision.[6] It noted Espinoza's long history of drug use and pointed out that, even when abstaining from drug and alcohol use, she used a "supercaffeinated" energy drink

---

[6] Espinoza claims the court prejudicially erred in its formulation of the applicable burden of proof. We address that claim in the Discussion, *post.*

10

that had some of the effects of an intoxicant. Appearing to refer to its ruling on the People's petition to extend Espinoza's commitment, the court found that, even if under CONREP's supervision, there remained "underlying and I believe as of yet not fully explored triggers that made Ms. Espinoza a danger to the health and safety of others."

Espinoza timely appealed the trial court's order. (See § 1237, subd. (a) [an appeal may be taken from "the commitment of a defendant for insanity"].) The case was fully briefed in January 2023 and was assigned to this panel on January 31, 2023.

## DISCUSSION

### I

### *Extending Espinoza's Commitment*

Under section 1026.5, subdivision (a)(1), a person found not guilty of a felony by reason of insanity may be committed to a state hospital for a period no longer than the maximum prison sentence for his or her offenses. This commitment may be extended in up to two-year increments if, because of a mental disorder, the person both "represents a substantial danger of physical harm to others" (*id*., subd. (b)(1), (8)) and has "serious difficulty controlling his [or her] potentially dangerous behavior" (*People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1165 (*Zapisek*) [explaining due process requires this "serious difficulty" requirement]; see also *In re Lemanuel C*. (2007) 41 Cal.4th 33, 40-41 [before extending a civil commitment for a dangerous youth, due process requires a finding "that a mental deficiency, disorder, or abnormality causes serious difficulty in controlling the person's dangerous behavior"; "the constitutional principles set forth in those cases [developing this requirement] apply to all civil commitment schemes"]). A showing of historical dangerousness is insufficient; to satisfy the statute, the People must show a connection between the committee's ongoing mental illness and any *current* threat the individual might pose if not committed for an additional term. (See *People v. Redus* (2020) 54 Cal.App.5th 998, 1013 (*Redus*).)

11

" ' " 'Whether a defendant "by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others" under section 1026.5 is a question of fact to be resolved with the assistance of expert testimony.' [Citation.] 'In reviewing the sufficiency of evidence to support a section 1026.5 extension, we apply the test used to review a judgment of conviction; therefore, we review the entire record in the light most favorable to the extension order to determine whether any rational trier of fact could have found the requirements of section 1026.5(b)(1) beyond a reasonable doubt. [Citations.]' [Citation.]" [Citation.] A single psychiatric opinion that an individual is dangerous because of a mental disorder constitutes substantial evidence to support an extension of the defendant's commitment under section 1026.5.' " (*Zapisek*, *supra*, 147 Cal.App.4th at p. 1165.) "However, 'expert medical opinion evidence that is based upon a " 'guess, surmise or conjecture, rather than relevant, probative facts, cannot constitute substantial evidence.' " ' " (*Redus*, *supra*, 54 Cal.App.5th at p. 1011.)

Espinoza does not dispute that she has been diagnosed with schizoaffective disorder (bipolar type), a mental disorder. But she contends there is no substantial evidence that she posed a substantial danger of physical harm to others or that she had serious difficulty controlling her dangerous behavior. She argues the state's expert witnesses based their opinions of her dangerousness on a definition of "physical harm" that included psychological harm, the trial court improperly relied on her historical--rather than current--dangerousness to determine that she represented a substantial danger of physical harm to others, and the undisputed evidence shows she has not committed a physically aggressive act since she was committed in 2016. As we next explain, our review of the record demonstrates substantial evidence supports the court's extension order.

A. *Substantial Danger of Physical Violence to Others*

There is substantial evidence that Espinoza currently represents a substantial danger of physical violence to others. During both of Espinoza's recent

12

decompensations, she failed to recognize the warning signs of decompensation or report her symptoms, and she continued to lack understanding of the severity of her delusions and behaviors and instead minimized her risk of violence. During her May 2020 decompensation, Espinoza consumed alcohol, became delusional, and purchased two knives, one of which she carried on her person, and the other she prepared to send to the victim of her stalking offense. Dr. Powers noted that Espinoza continued to have gaps in her understanding as to why she purchased the knives and what she planned to do with them. In August 2021, she made "cold threats" to staff and had to be segregated from her roommates due to her risk of violence. Dr. Powers and Love testified that her behavior during her decompensations mirrored her behavior in her committing offenses, indicating that Espinoza was recently in a mindset similar to that displayed when she last acted in a physically violent manner while delusional.

Espinoza argues that the trial court impermissibly focused on her history of violence rather than her current dangerousness. We disagree. Espinoza's past acts are generally relevant to determining whether her condition, at the time of a recommitment hearing, rendered her dangerous to others. (See *People v. Pace* (1994) 27 Cal.App.4th 795, 799 [a mental health professional, when assessing a defendant's risk of physical harm to others, "should take into account the prisoner's entire history . . . . This includes prior violent offenses as well as the prisoner's mental health history"].) Additionally, as we have discussed, Espinoza's behavior while decompensated in May 2020 and August 2021 mirrored the behavior she exhibited when she was stalking the deputy and committing the offenses--some violent--that led to her commitment. Given that Espinoza was recently in that same mindset, the nature of those prior offenses was relevant to the court's determination of her current dangerousness. Further, as we will discuss in greater detail *post*, evidence of Espinoza's history of violence when behaving similarly to her behavior while decompensated in May 2020 and August 2021 was relevant to refute the

13

argument that she did not represent a risk of physical violence based on the fact that she had not been physically violent since being committed in 2016.

This court's recent opinion in *People v. Cheatham* (2022) 82 Cal.App.5th 782 provides a useful comparison to the facts here. In *Cheatham*, the evidence was insufficient to support an extension of the defendant's involuntary commitment because the link between the mental disorder and the threat of harm to others was not shown. Cheatham had been diagnosed with schizoaffective disorder and a separate substance use disorder. Expert witnesses testified to Cheatham's bizarre behavior, various rule violations, and addictive behavior, and expressed the concern that he might discontinue using his medications upon being released, leading to his mental decline. But no evidence was offered to show Cheatham had engaged in any dangerous behavior, and on appeal we concluded there was no evidence he would have serious difficulty controlling his dangerous behavior should he discontinue his medication and experience hallucinations. (*Id.* at p. 790.) Because Cheatham had never posed a danger of physical harm to anyone in the past, any speculation he might pose such a threat in the future was not enough to satisfy the substantial evidence test. (*Id.* at pp. 793-794.)

In contrast to the facts in *Cheatham*, Espinoza has a history of violent conduct when decompensated and acting pursuant to her delusional beliefs, and the similarity of her recent conduct to that of her committing offense establishes a link between her prior violent acts and her current dangerousness. (See *Redus*, *supra*, 54 Cal.App.5th at p. 1013.)

Espinoza also argues the state's expert witnesses failed to provide substantial evidence that she was currently dangerous because their opinions regarding her dangerousness were based on the risk of psychological, rather than physical, harm. She points to Dr. Powers's testimony that threats to the deputy constituted violence under the HCR-20, and Love's testimony that Espinoza's conduct induced fear in the therapist. But the trial court did not suggest that it based its conclusion regarding Espinoza's

14

dangerousness on her risk of inflicting *psychological* harm, and there is substantial evidence in the record to support the finding that Espinoza represented a substantial risk of *physical* harm, as we have described. Indeed, the court recognized that Espinoza had not engaged in "actual violence as a direct result of these delusions" since she had been committed, but it observed that Espinoza had previously committed physically violent acts as a collateral function of her delusions. There is substantial evidence to support the trial court's order, and nothing suggests the court misapplied the law.

B. *Serious Difficulty Controlling Dangerous Behavior*

There is also substantial evidence in the record to support the trial court's finding that Espinoza had serious difficulty controlling her dangerous behavior. Dr. Powers, Dr. Stotler-Turner, and Love testified that Espinoza failed to recognize the early signs her May 2020 and August 2021 decompensations and continued to lack sufficient insight into her mental illness. Lack of control over a behavior is often a factor considered when courts are contemplating whether to extend a commitment related to mental health. (See *In re Howard N.* (2005) 35 Cal.4th 117, 129.) While decompensated on CONREP, Espinoza prepared a box for the victim of her stalking offense that contained a knife, and she had to be taken into custody and readmitted to the hospital. A year later, while hospitalized, she again experienced a "very rapid" decompensation and had to be segregated from her roommates due to her risk of violence. That her behavior while decompensated in May 2020 and August 2021 mirrored her behavior during her committing offenses further demonstrated that she continued to have difficulty controlling the behavior that led to her being committed.

We disagree with Espinoza's argument that because she had not committed a physically aggressive act since being committed in 2016, she does not have difficulty controlling dangerous behavior. She points to *People v. Bowers* (2006) 145 Cal.App.4th 870, and *Zapisek*, *supra*, 147 Cal.App.4th 1151, but those cases do not assist her. In *Bowers*, the committee had a history of assaultive behavior toward others and had

15

attempted suicide two months before her interview with one of the state's experts. (*Bowers*, at p. 879.) In *Zapisek*, the committee continued to experience delusions similar to those he experienced when he committed his original offense of stabbing a stranger because he believed the stranger was the devil incarnate. (*Zapisek*, at pp. 1154, 1155, 1166.) But while the committees in those cases committed overt violent acts, such overt acts are not required. (*People v. Overly* (1985) 171 Cal.App.3d 203, 208 ["proof of a recent overt act is not constitutionally required to extend the commitment of a person found to be criminally insane"].)

As the Attorney General points out, "[t]he fact that [the] defendant has not misbehaved in a strictly controlled hospital environment does not prove [s]he no longer suffers from a mental disorder that poses a danger to others." (*People v. Sumahit* (2005) 128 Cal.App.4th 347, 353.) Here, Dr. Powers testified that Espinoza's lack of violence in the hospital is not dispositive because the hospital has structures in place specifically designed to mitigate patients' risk of violence. Rather, her failure to recognize and report her decompensations, and the speed with which she began to develop violent ideations, is substantial evidence that she continued to have serious difficulty controlling her dangerous behavior. Finally, although Espinoza did not commit a physically violent act while on CONREP, she became delusional, purchased two knives, carried one and prepared to send the other to the victim of her stalking offense, and consumed alcohol. While she did not become physically violent before being arrested, she posed a significant risk of becoming violent at that time.

Substantial evidence supports the trial court's order extending Espinoza's commitment.[7]

---

[7] Because we conclude substantial evidence supports the trial court's findings, we do not address Espinoza's claim that the People are barred from refiling the petition upon a finding of insufficient evidence.

*Shifting Burden of Proof to the People*

To succeed on her petition for release to the community under the supervision of CONREP, Espinoza was required to prove by a preponderance of the evidence that she will not "be a danger to the health and safety of others, due to mental defect, disease, or disorder, while under supervision and treatment in the community." (§ 1026.2, subds. (e), (k).) Although Espinoza indisputably bore the burden of proof, the trial court shifted the burden of proof to the People when rendering its verdict: "[T]he Court must find by a preponderance of the evidence that Ms. Espinoza *would be* a danger to health and safety of others due to the mental disease even if under supervision and treatment in the community, and [it] will find that that preponderance has been met and she still would be a danger even if she's under supervision treatment by the community." (Italics added.)[8]

"Misallocation of the burden of proof in a bench trial is not reversible error per se but must be prejudicial to warrant reversal. [Citation.] Prejudice means ' "a reasonable probability that in the absence of the error, a result more favorable to [the appellant] would have been reached." ' [Citation.] A probability does not mean 'more likely than not' but 'a *reasonable chance*, more than an *abstract possibility*.' " (*Navigators Specialty Ins. Co. v. Moorefield Construction, Inc.* (2016) 6 Cal.App.5th 1258, 1287.)

Espinoza claims that the trial court's error prejudiced her in two ways. First, she contends the error eliminated her statutory right to produce evidence to support her petition. But Espinoza presented evidence, and she does not explain how she was prevented from doing so. Further, her petition asserted that she bore the burden of

---

[8] The Attorney General contends that Espinoza forfeited this argument by failing to object at trial, while Espinoza responds the issue is strictly legal and should be reviewed for the first time on appeal. Because we conclude the trial court's error was clearly harmless, we need not and do not address forfeiture.

proving by a preponderance of the evidence that she no longer posed a danger to the health and safety of others, and the trial court did not erroneously shift the burden to the People until all the evidence had been presented. Accordingly, Espinoza understood throughout trial that she bore the burden of proof, and there is nothing to suggest that she was prevented from presenting evidence to support her petition.

Second, Espinoza contends the trial court's error lowered the burden for the People to extend her commitment. To the contrary, the court expressly applied the beyond-a-reasonable-doubt standard to the People's petition to extend Espinoza's commitment. The court stated: "[O]n the petition for extension, the Court will be applying the burden required by the statute and is finding beyond a reasonable doubt that, due to suffering from a mental disorder, as a result of that mental disorder, Ms. Espinoza poses substantial danger of physical harm to others and has serious difficulty controlling her dangerous behavior." The court then reiterated: "Now, despite that being a very high burden, beyond a reasonable doubt, I think there is a clear basis for the Court's finding in this regard." Thus, there is nothing to suggest that the court lowered the People's burden regarding its petition to extend Espinoza's commitment.

Because the effect of the trial court's error was to raise the People's burden and lower Espinoza's, there is no reasonable likelihood that a result more favorable to her would have been reached absent the error.

18

## DISPOSITION

The trial court's orders extending Espinoza's commitment and denying her petition for outpatient treatment in the community are affirmed.

          /s/            
Duarte, J.

We concur:

     /s/          
Mauro, Acting P. J.

     /s/          
Boulware Eurie, J.